JONES, DIRECTOR, DEPARTMENT OF WEIGHTS
AND MEASURES, RIVERSIDE COUNTY *v.*
RATH PACKING CO. ET AL.

No. 75–1053.   Argued December 6–7, 1976—Decided March 29, 1977*

*Together with *Jones, Director, Department of Weights and Measures, Riverside County* v. *General Mills, Inc., et al.*, also on certiorari to the same court (see this Court's Rule 23 (5)).

520

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed an opinion concurring in part and dissenting in part, in which STEWART, J., joined, *post*, p. 543.

*Loyal E. Keir* argued the cause for petitioner. With him on the briefs was *Ray T. Sullivan, Jr.*

*Dean C. Dunlavey* argued the cause and filed a brief for respondents.

*Allan J. Goodman,* Deputy Attorney General of California, argued the cause for 39 States et al. as *amici curiae* urging reversal. With him on the brief were *Evelle J. Younger,* Attorney General, *Carl Boronkay,* Assistant Attorney General, and *Herschel T. Elkins,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *William J. Baxley* of Alabama, *Avrum Gross* of Alaska, *Bruce E. Babbitt* of Arizona, *Jim Guy Tucker* of Arkansas, *J. D. MacFarlane* of Colorado, *Richard R. Wier, Jr.,* of Delaware, *Robert L. Shevin* of Florida, *Arthur K. Bolton* of Georgia, *Ronald Y. Amemiya* of Hawaii, *Wayne L. Kidwell* of Idaho, *William J. Scott* of Illinois, *Curt T. Schneider* of Kansas, *Robert F. Stephens* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *Joseph E. Brennan* of Maine, *Francis B. Burch* of Maryland, *Francis X. Bellotti* of Massachusetts, *Frank J. Kelly* of Michigan, *A. F. Summer* of Mississippi, *John C. Danforth* of Missouri, *Robert L. Woodahl* of Montana, *Paul L. Douglas* of Nebraska, *Robert List* of Nevada, *David H. Souter* of New Hampshire, *Toney Anaya* of New Mexico, *Rufus L. Edmisten* of North Carolina, *Allen I. Olson* of North Dakota, *William J. Brown* of Ohio, *Larry Derryberry* of Oklahoma, *Lee Johnson* of Oregon, *Daniel R. McLeod* of South Carolina, *William J. Janklow* of South Dakota, *John L. Hill* of Texas, *Vernon B. Romney* of Utah, *Andrew P. Miller* of Virginia, *Slade*

*Gorton* of Washington, *Chauncey H. Browning, Jr.,* of West Virginia, and *V. Frank Mendicino* of Wyoming.†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner Jones is Director of the Department of Weights and Measures in Riverside County, Cal.[1]  In that capacity he ordered removed from sale bacon packaged by respondent Rath Packing Co. and flour packaged by three millers, respondents General Mills, Inc., Pillsbury Co., and Seaboard Allied Milling Corp. (hereafter millers).  Jones acted after determining, by means of procedures set forth in 4 Cal. Admin. Code c. 8, Art. 5, that the packages were contained in lots [2] whose average net weight was less than the net weight stated on the packages.  The removal orders were authorized by Cal. Bus. & Prof. Code § 12211 (West Supp. 1977).[3]

†*Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Philip Weinberg* and *Paul S. Shemin,* Assistant Attorneys General, filed a brief for the State of New York as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Bork, Assistant Attorney General Lee,* and *Mark L. Evans* for the United States; by *H. Templeton Brown, Robert L. Stern,* and *William A. Gordon* for the American Meat Institute; by *Jonathan W. Sloat* for the Grocery Manufacturers of America, Inc.; and by *Edwin H. Pewett* and *James M. Kefauver* for the National Independent Meat Packers Assn. et al.

[1] The title "county director of weights and measures" is a statutory alternative to the title "county sealer."  Cal. Bus. & Prof. Code § 12006 (West 1964).  The office of county sealer is established and its duties prescribed by §§ 12200–12214 (West 1964 and Supp. 1977).

[2] " 'Lot' means the total number of packages of a single item of merchandise in a single size at one location and may contain two or more 'sub-lots.'

" 'One location' shall be construed to mean 'one display' or 'one grouping,' and does not, for example, mean all items of the same brand and size stored or kept for sale in one establishment."  4 Cal. Admin. Code § 2931.3 (1970).

[3] "Each sealer shall, from time to time, weigh or measure packages, containers or amounts of commodities sold, or in the process of delivery, in

Rath and the millers responded by filing suits in the District Court for the Central District of California.[4] They sought both declarations that § 12211 and Art. 5 are pre-

order to determine whether the same contain the quantity or amount represented and whether they are being sold in accordance with law.

"The director [of agriculture] is hereby authorized and directed to adopt and promulgate necessary rules and regulations governing the procedures to be followed by sealers in connection with the weighing or measuring of amounts of commodities in individual packages or containers or lots of such packages or containers, including the procedures for sampling any such lot, and in determining whether any package or container or a lot of such packages or containers complies with the provisions of this section. . . .

"Any such rule or regulation, or amendment thereof, shall be adopted and promulgated by the director in conformity with the provisions of Chapter 4.5 (commencing with Section 11371), of Part 1 of Division 3 of Title 2 of the Government Code; provided, that the average weight or measure of the packages or containers in a lot of any such commodity sampled shall not be less, at the time of sale or offer for sale, than the net weight or measure stated upon the package, and provided further, that said rules or regulations applicable to food, as defined in Section 26450 of the Health and Safety Code, insofar as possible, shall not require higher standards and shall not be more restrictive than regulations, if any, promulgated by the Department of Health, Education, and Welfare, Food and Drug Administration, under the provisions of the Federal Food, Drug and Cosmetic Act.

"Any lot or package of any such commodity which conforms to the provisions of this section shall be deemed to be in conformity with the provisions of this division relating to stated net weights or measures.

"Whenever a lot or package of any commodity is found to contain, through the procedures authorized herein, a less amount than that represented, the sealer shall in writing order same off sale and require that an accurate statement of quantity be placed on each such package or container before same may be released for sale by the sealer in writing. The sealer may seize as evidence any package or container which is found to contain a less amount than that represented."

[4] Rath filed separate actions against Jones and M. H. Becker, Director of the County Department of Weights and Measures of Los Angeles County. The two actions were consolidated for decision in the District

empted by federal laws regulating net-weight labeling and injunctions prohibiting Jones from enforcing those provisions. The District Court granted the requested relief [5] and, insofar as is relevant here, the Court of Appeals affirmed.[6] We granted Jones' petition for certiorari, 425 U. S. 933 (1976),[7] and now affirm the judgments of the Court of Appeals.

I

In its present posture, this litigation contains no claim that the Constitution alone denies California power to enact

_____

Court after trial of the action against Becker and argument of cross-motions for summary judgment in the suit against Jones. *Rath Packing Co.* v. *Becker*, 357 F. Supp. 529, 531 (CD Cal. 1973). The Director of Food and Agriculture of the State of California intervened as a defendant in the *Becker* proceeding. The millers filed a single action against Jones.

[5] The District Court's opinion in Rath's suit is reported as *Rath Packing Co.* v. *Becker, supra.* The decision in the millers' action is not separately reported, but is reprinted as an appendix to the Court of Appeals' opinion. *General Mills, Inc.* v. *Jones,* 530 F. 2d 1317, 1329–1330 (CA9 1975).

Rath's argument that 21 U. S. C. § 607 (b) limits enforcement of the accuracy requirement to the time meat or meat food products leave the processing plant was rejected by the District Court, 357 F. Supp., at 532, as were the millers' contentions that California's inspection laws unreasonably burden interstate commerce and deny manufacturers due process of law. See *General Mills, Inc.* v. *Jones, supra,* at 1322–1323.

[6] *Rath Packing Co.* v. *Becker,* 530 F. 2d 1295 (CA9 1975); *General Mills, Inc.* v. *Jones, supra.*

The Court of Appeals reversed the District Court's holding that the governing federal regulations, 9 CFR § 317.2 (h) (2) (1976) and 21 CFR § 1.8b (q) (1976), are void for vagueness. *Rath Packing Co.* v. *Becker, supra,* at 1308–1312; *General Mills, Inc.* v. *Jones, supra,* at 1323–1324. The validity of the regulations is not at issue here.

[7] Jones' single petition for certiorari sought review of the judgments in both *Rath Packing Co.* v. *Becker, supra,* and *General Mills, Inc.* v. *Jones, supra.* See this Court's Rule 23 (5). No action has been taken on the separate petition for certiorari filed by California's Director of Food and Agriculture, see n. 4, *supra,* and Becker. *Wallace* v. *Rath Packing Co.,* cert. pending, No. 75–1052.

the challenged provisions.[8] We are required to decide only whether the federal laws which govern respondents' packing operations preclude California from enforcing § 12211, as implemented by Art. 5.

Our prior decisions have clearly laid out the path we must follow to answer this question. The first inquiry is whether Congress, pursuant to its power to regulate commerce, U. S. Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case. Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, e. g., U. S. Const., Art. I, § 10; *Patapsco Guano Co.* v. *North Carolina,* 171 U. S. 345, 358 (1898), "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). This assumption provides assurance that "the federal-state balance," *United States* v. *Bass,* 404 U. S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has "unmistakably . . . ordained," *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142 (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *City of Burbank* v. *Lockheed Air Terminal, Inc.,* 411 U. S. 624, 633 (1973); *Rice* v. *Santa Fe Elevator Corp., supra,* at 230.

Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws

---

[8] The Court of Appeals affirmed the District Court's holding, see n. 5, *supra,* that the California provisions violate neither the Commerce Clause nor the Fourteenth Amendment. 530 F. 2d, at 1322–1323. The millers do not challenge these holdings here.

with which they conflict. U. S. Const., Art. VI. The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our decisions. Our task is "to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U. S. 52, 67 (1941). Accord, *De Canas v. Bica*, 424 U. S. 351, 363 (1976); *Perez v. Campbell*, 402 U. S. 637, 649 (1971); *Florida Lime & Avocado Growers, Inc. v. Paul, supra*, at 141; *id.*, at 165 (WHITE, J., dissenting). This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written. See *De Canas v. Bica, supra*, at 363–365; *Swift & Co. v. Wickham*, 230 F. Supp. 398, 408 (SDNY 1964), appeal dismissed, 382 U. S. 111 (1965), aff'd on further consideration, 364 F. 2d 241 (CA2 1966), cert. denied, 385 U. S. 1036 (1967).

## II

Section 12211 of the Cal. Bus. & Prof. Code (West Supp. 1977) applies to both Rath's bacon and the millers' flour. The standard it establishes is straightforward: "[T]he average weight or measure of the packages or containers in a lot of any . . . commodity sampled shall not be less, at the time of sale or offer for sale, than the net weight or measure stated upon the package."

In order to determine whether that standard has been violated, local officials such as Jones follow the statistical sampling procedure set forth in Art. 5.[9] That procedure requires the inspector to identify a lot of identical packages of a commodity and determine the number of packages in that lot.

---

[9] The District Court concluded that the Art. 5 "procedure is a statistical determination based upon normal and proven statistical standards." 357 F. Supp., at 533. The statistical validity of the procedure has not been challenged.

He then determines, from tables in the regulation, the number of packages necessary to provide a suitable sample of the lot, and a smaller number of packages which is used to determine the average tare.[10]  After determining that average, the inspector weighs each package in the sample, subtracts the average tare, and records the difference between the measured and the stated net weights.  These measurements are used to identify individual packages in the sample which deviate unreasonably from the stated weight.  Those packages are replaced[11] in the sample and the replacements weighed.

---

[10] "Tare" is the weight of the packing material in which the product is contained.  In order to determine the tare, the inspector weighs each package and then removes and weighs the contents of each package. By subtracting the net weight from the gross weight, he obtains the tare.

After it is packed, bacon loses moisture.  Some of that moisture is absorbed by the insert on which the bacon is placed.  A wax board insert will absorb approximately 5/16 of an ounce from the product, whereas a polyethylene insert will absorb approximately 1/16 of an ounce.  App. 88–90, 94; 530 F. 2d, at 1299 n. 2.  In addition, moisture is lost to the atmosphere or, in a hermetically sealed package, by condensation onto the packing material.  App. 61.  California's inspectors include in the weight of the material any moisture or grease which the bacon has lost to it. Federal inspectors at the packing plant, by contrast, determine the tare by weighing the packing material dry.  530 F. 2d, at 1299.  It is not feasible for field inspectors to use a dry tare method.  C. Brickenhamp, S. Hasko, & M. Natrella, Checking Prepackaged Commodities—Revision of National Bureau of Standards Handbook 67, p. 33 (July 1975 Draft).

After noting this difference, the Court of Appeals stated: "The difference in tares employed is not an issue in this case."  530 F. 2d, at 1299 n. 4.  Respondents have, nevertheless, suggested that the divergence in results produced by the two techniques requires federal pre-emption, Brief for Respondents 18–19, 37; Tr. of Oral Arg. 43–44.  We consider the difference significant only insofar as it is an aspect of the State's failure to allow variations from stated weight resulting from loss of moisture during good distribution practice.  See *infra,* at 531–532.

[11] "The individual unreasonable errors, both plus and minus, are excluded from the average, because they are acted upon individually and because their inclusion could destroy or alter the packaging pattern.  For instance: A sample of ten (10) packages could show nine (9) packages

Finally, the deviations from the stated weight are totaled algebraically and compared with tables which indicate the magnitude of the total error necessary to conclude that the lot's average weight is or is not less than the stated weight.[12]

### III

A. Rath's bacon is produced at plants subject to federal inspection under the Federal Meat Inspection Act (FMIA or Act), as amended by the Wholesome Meat Act, 81 Stat. 584, 21 U. S. C. § 601 *et seq.* Among the requirements imposed on federally inspected plants, and enforced by Department of Agriculture inspectors,[13] are standards of accuracy in labeling. On the record before us, we may assume that Rath's bacon complies with these standards.[14]

The federal labeling requirement is imposed by § 7 (b) of the FMIA, 81 Stat. 588, 21 U. S. C. § 607 (b), which commands:

"All . . . meat and meat food products inspected at any

---

each with a minus error of 1, and one package with a plus error of 9. If the large plus error is included, the total error is 0. Obviously, the pattern of the sample is a minus 1 per package." 4 Cal. Admin. Code § 2933.3.11 (1961).

Enforcement action is taken against packages with unreasonably large minus errors. § 2933.3.12 (c) (1970).

[12] If the result of the sampling is not conclusive, additional samples may be drawn. §§ 2933.3.12 (a), (b) (1961).

[13] Rath's procedures for assuring that its bacon packages contain the stated net weight have been submitted to the Department of Agriculture for approval. 530 F. 2d, at 1298; Brief for Respondents 9. When an approved plan is in effect, the federal inspector reviews records and observes procedures to assure compliance with the plan. The inspector is also required to sample one subgroup at least twice a week and to check the weight of a production lot at least once a week. U. S. Department of Agriculture, Meat and Poultry Inspection Manual § 18.61 (b) (1) (i) (1973). When no approved plan is in effect, the inspector samples at least 10 lots each week, unless production volume is low. *Id.,* at 18.61 (b) (2).

[14] See 530 F. 2d, at 1299.

establishment under the authority of this title . . . shall at the time they leave the establishment bear . . . the information required under paragraph (n) of section 1 of this Act."

Section 1 (n) of the FMIA, 21 U. S. C. § 601 (n), defines the term "misbranded." As relevant here, it provides that meat or a meat product is misbranded

"(5) if in a package or other container unless it bears a label showing . . . (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That . . . reasonable variations may be permitted, and exemptions as to small packages may be established, by regulations prescribed by the Secretary." 81 Stat. 586.

Other sections of the FMIA prohibit dealing in misbranded products, as defined by § 1 (n).[15]

The Secretary of Agriculture has used his discretionary authority to permit "reasonable variations" in the accuracy of the required statement of quantity:

"The statement [of net quantity of contents] as it is shown on a label shall not be false or misleading and shall express an accurate statement of the quantity of contents of the container exclusive of wrappers and packing substances. Reasonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practice will be recognized. Variations from stated quantity of contents shall not be unreasonably large." 9 CFR § 317.2 (h)(2) (1976).

Thus, the FMIA, as implemented by statutorily authorized regulations, requires the label of a meat product accurately to indicate the net weight of the contents unless the difference

---

[15] 21 U. S. C. §§ 607 (d), 610 (b).

between stated and actual weights is reasonable and results from the specified causes.[16]

B. Section 408 of the FMIA, 21 U. S. C. § 678, prohibits the imposition of "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under" the Act.[17]   This explicit pre-emption provision

---

[16] Both sources of variation from stated weight are relevant to bacon. Bacon loses moisture to its wrapping materials and to the atmosphere. See n. 10, *supra*. The rate of loss to the atmosphere in a typical retail showcase is $0.\frac{3}{16}$ to $0.\frac{4}{16}$ of an ounce per day.   App. 95.   In addition, since bacon is cut in discrete slices, it is impossible to guarantee that each package will contain exactly the stated weight when packed.   Instead of seeking exactitude, Rath approved packages if they were within $\frac{5}{16}$ of an ounce of a target weight.   Prior to petitioner's enforcement activities, and the similar activities of Becker, see n. 4, *supra*, Rath's target weight was $\frac{3}{16}$ of an ounce over the stated weight, or 1 lb. $\frac{3}{16}$ oz. for a one-pound package.   Thus, a package would be passed if it weighed between $15\frac{14}{16}$ oz. and 1 lb. $\frac{8}{16}$ oz.   In response to the California enforcement measures, Rath raised its target weight to $\frac{8}{16}$ oz. over stated net weight for bacon packed on a polyethylene insert, and $\frac{12}{16}$ oz. over stated weight for bacon packed on wax boards.   App. 86–89.

[17] Section 408, 81 Stat. 600, states in full:

"Requirements within the scope of this Act with respect to premises, facilities and operations of any establishment at which inspection is provided under title I of this Act, which are in addition to, or different than those made under this Act may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of section 202 of this Act if consistent therewith, with respect to any such establishment. Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this Act may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under title I of this Act, but any State or Territory or the District of Columbia may, consistent with the requirements under this Act, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said title, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry

dictates the result in the controversy between Jones and Rath. California's use of a statistical sampling process to determine the average net weight of a lot implicitly allows for variations from stated weight caused by unavoidable deviations in the manufacturing process.[18] But California makes no allowance for loss of weight resulting from moisture loss during the course of good distribution practice.[19] Thus, the state

---

into the United States. This Act shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this Act, with respect to any other matters regulated under this Act."

[18] The implicit recognition of manufacturing variations results from California's use of the statistically estimated average weight of the lot to determine whether the label accurately indicates the contents. By averaging the weight of the packages in the sample, California allows individual deviations around the packer's target weight to cancel each other out. The average weight of the sample should equal the target weight, see n. 16, supra, with allowance for sampling variation and moisture loss. Article 5 utilizes tables which recognize sampling variation, but it makes no allowance for moisture loss.

The Department of Agriculture itself uses statistical sampling techniques, including reliance on average lot weight to account for manufacturing deviations. See Meat and Poultry Inspection Manual, supra, n. 13, at § 18.61 (b) (2); Brief for United States as Amicus Curiae 7 n. 4. Indeed, it is difficult to imagine any other practical technique for policing net-weight labeling requirements in a country where over 200 billion packages are produced every year. See Brickenhamp, Hasko, & Natrella, supra, n. 10, at 78. We have found no indication that Congress intended simultaneously to grant concurrent jurisdiction to the States to enforce net-weight labeling requirements, see n. 17, supra, and to deny them the only practical tool with which to do so. Accordingly, we disagree with anything in the opinions below that suggests that States may not use valid statistical sampling techniques, including reliance on lot average weights, to police compliance with federal and valid state net-weight labeling laws.

[19] Moisture loss during distribution will, obviously, cause the net weight of bacon to be less than it was when the bacon left the packing plant. An averaging procedure, in which deviations above the average cancel deviations below the average, does not make any allowance for moisture loss during good distribution practice, which works in only one direction.

law's requirement—that the label accurately state the net weight, with implicit allowance only for reasonable manufacturing variations—is "different than" the federal requirement, which permits manufacturing deviations *and* variations caused by moisture loss during good distribution practice.

Petitioner Jones seeks to avoid this result by arguing that. the FMIA's provisions governing the accuracy of the required net-quantity statements are not "labeling requirements" within the meaning of § 408. He contends that "labeling" refers only to the format and placement of information, not to its content.[20] Requirements relating to accuracy, according to Jones, deal with the problem of misbranding, and § 408 grants the States concurrent jurisdiction over that subject.

We agree with the Court of Appeals that this argument is "strained." 530 F. 2d, at 1314 n. 25. Nothing in the Act suggests the restrictive meaning petitioner ascribes to the phrase "labeling requirements." To the contrary, § 7 (b) requires that the product bear specified information, see *supra*, at 528–529, and § 1 (p) of the FMIA, 21 U. S. C. § 601 (p),[21] makes clear that any material bearing that information is part of the product's labeling. It twists the language beyond the breaking point to say that a law mandating that labeling contain certain information is not a "labeling requirement."

We therefore conclude that with respect to Rath's packaged bacon, § 12211 and Art. 5 are pre-empted by federal law.

## IV

A. The federal law governing net-weight labeling of the millers' flour is contained in two statutes, the Federal Food, Drug, and Cosmetic Act (FDCA), 52 Stat. 1040, as amended,

---

[20] Brief for Petitioner 40. See also Brief for 39 States as *Amici Curiae* 56–58.

[21] "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." § 1 (p), 81 Stat. 587.

21 U. S. C. § 301 *et seq.,* and the Fair Packaging and Labeling Act (FPLA), 80 Stat. 1296, as amended, 15 U. S. C. §§ 1451–1461. For the reasons stated below, we conclude that the federal weight-labeling standard for flour is the same as that for meat.

The FDCA prohibits the introduction or delivery for introduction into interstate commerce of any food[22] that is misbranded. 21 U. S. C. § 331. A food is misbranded under the FDCA,

> "[i]f in package form unless it bears a label containing . . . an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That . . . reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary." § 343 (e).

This provision is identical to the parallel provision in the FMIA, see *supra,* at 529, except that the FDCA mandates rather than allows the promulgation of implementing regulations.[23] The regulation issued in response to this statutory mandate is also substantially identical to its counterpart under the FMIA:

> "The declaration of net quantity of contents shall express an accurate statement of the quantity of contents of the package. Reasonable variations caused by loss or gain of moisture during the course of good distribution practice or by unavoidable deviations in good manufacturing practice will be recognized. Variations from stated quantity of contents shall not be unreasonably large." 21 CFR § 1.8b (q) (1976).

---

[22] Flour is a food within the coverage of the Act. See 21 U. S. C. § 321 (f).

[23] The definition of "misbranded" in the FMIA is based on the definition in the FDCA. See S. Rep. No. 799, 90th Cong., 1st Sess., 7 (1967).

Since flour is a food under the FDCA, its manufacture is also subject to the provisions of the FPLA. See 15 U. S. C. §§ 1452, 1459 (a). That statute states a congressional policy that "[p]ackages and their labels should enable consumers to obtain accurate information as to the quantity of the contents and should facilitate value comparisons." § 1451. To accomplish those goals, insofar as is relevant here, the FPLA bans the distribution in commerce of any packaged commodity unless it complies with regulations

"which shall provide that—

.        .        .        .        .

"(2) The net quantity of contents (in terms of weight, measure, or numerical count) shall be separately and accurately stated in a uniform location upon the principal display panel of [the required] label." § 1453 (a).

The FPLA also contains a saving clause which specifies that nothing in the FPLA "shall be construed to repeal, invalidate, or supersede" the FDCA. § 1460. Nothing in the FPLA explicitly permits any variation between stated weight and actual weight.

The *amici* States contend that since the FPLA does not allow any variations from stated weight, there is no difference between federal law governing labeling of flour and California law. The Court of Appeals, however, held that because of the saving clause, compliance with the FDCA, which does allow reasonable variations, satisfies the requirements of the FPLA. 530 F. 2d, at 1325. *Amici* respond that the Court of Appeals misinterpreted the FDCA and that the FDCA establishes a statutory standard of strict accuracy for net-weight labeling. They argue, therefore, that the saving clause of the FPLA does not alter the standard mandated by § 1453. Brief for 39 States as *Amici Curiae* 15–21. Alternatively, the States argue that although the saving clause means that the FPLA does not supersede the FDCA, "it

cannot be construed to excuse compliance with FPLA standards where both FDCA and FPLA requirements are applicable." *Id.*, at 28.

The States' argument that the FDCA standard makes no allowance for reasonable variations is based on this Court's opinion in *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77 (1932). *Shreveport* decided an appeal by the Government in a criminal case involving shortweighting in violation of the predecessor of the FDCA, the Food and Drugs Act, 34 Stat. 768, as amended, c. 117, 37 Stat. 732. The trial court had dismissed the indictment under that statute, which was essentially identical to the net-weight labeling requirement of the FDCA,[24] on the ground that the prohibition of unreasonable variations from the marked weight was too indefinite to state a criminal offense. We reversed, holding that the statute's substantive standard was created by the "accurate statement" language which preceded the proviso allowing reasonable variations, and that the proviso merely granted administrative authority to promulgate regulations permitting variations "from the hard and fast rule of the act." 287 U. S., at 81–82. Since Congress re-enacted the language interpreted by the *Shreveport* Court, FDCA, c. 675, § 403 (e), 52 Stat. 1047, *amici* conclude that the standard under the FDCA is also a "hard and fast rule."

We need not decide whether the rationale as well as the

---

[24] The statute construed in *Shreveport* provided that a food would be considered misbranded—

"If in package form, the quantity of the contents be not plainly and conspicuously marked on the outside of the package in terms of weight, measure, or numerical count: *Provided, however,* That reasonable variations shall be permitted, and tolerances and also exemptions as to small packages shall be established by rules and regulations made in accordance with the provisions of Section three of this Act." 287 U. S., at 81.

result of *Shreveport* remains good law.[25]   It is clear that 21 CFR § 1.8b (q) (1976), insofar as it is based on the FDCA, has the force of law[26] and allows reasonable variations.   Thus, whether the statutory standard is viewed as strict, with the regulation considered a restriction on the power to prosecute, or whether the standard is itself viewed as incorporating the flexibility of the proviso and its implementing regulation,[27] the result is the same.   Under the FDCA, reasonable variations from the stated net weight do not subject a miller to prosecution, whether civil or criminal, if the variations arise from the permitted causes.   The question raised by the arguments of *amici* is whether by enacting the FPLA, Congress intended to eliminate the area of freedom from prosecution created by the FDCA and its implementing regulation.

Over 60 years ago, Congress concluded that variations must be allowed because of the nature of certain foods and the impossibility of developing completely accurate means of packing.   H. R. Rep. No. 850, 62d Cong., 2d Sess., 2

---

[25] We have subsequently cited *Shreveport* as an example of a case where a criminal statute has been found not impermissibly vague although it did not provide an unmistakably clear line between prohibited and permitted conduct.   *Jordan* v. *De George,* 341 U. S. 223, 231 n. 15 (1951); *Gorin* v. *United States,* 312 U. S. 19, 27 n. 13 (1941).

[26] *United States* v. *Mersky,* 361 U. S. 431, 437–438 (1960); *Atchison, T. & S. F. R. Co.* v. *Scarlett,* 300 U. S. 471, 474 (1937).

[27] This view, although contrary to the Court's analysis in *Shreveport,* is strongly supported by the legislative history of the statutory provision for reasonable variations.   As originally passed, the Food and Drugs Act did not require packages to bear a statement of net weight, but it did require that any statement of weight be plain and correct.   § 8, 34 Stat. 771.   In 1913 Congress changed the law by requiring that labels state the quantity of contents, and at the same time it added the recognition of reasonable variations.   C. 117, 37 Stat. 732.   Both the House and Senate committee reports stated that "[u]nder the terms of the bill reasonable variations are permitted, whether tolerances are or are not established by the rules and regulations . . . ."   H. R. Rep. No. 850, 62d Cong., 2d Sess., 3 (1912); S. Rep. No. 1216, 62d Cong., 3d Sess., 3 (1913).

(1912); S. Rep. No. 1216, 62d Cong., 3d Sess., 2–3 (1913).[28] Since 1914, regulations under the food and drug laws have permitted reasonable variations from stated net weight resulting from packing deviations or gain or loss of moisture occurring despite good commercial practice. See *United States* v. *Shreveport Grain & Elevator Co., supra,* at 84. If Congress had intended to overrule this longstanding administrative practice, founded on a legislative statement of necessity, we would expect it to have done so clearly. Instead, it explicitly preserved existing law, with "no changes." 15 U. S. C. § 1460; S. Rep. No. 1186, 89th Cong., 2d Sess., 20 (1966). The legislative history of the FPLA contains some indication that the saving clause was understood to preserve the reasonable-variation regulation under the FDCA,[29] and no evidence that Congress affirmatively intended to overrule that regulation.[30] We can only conclude that under the FPLA, as under the FDCA, a manufacturer of food is not

---

[28] The language of the two committee reports is identical:

"It being apparent to everyone that it is impossible to make packages of exactly the same size or to pack them with exactly the same quantity of contents, and it being also apparent that the exact weight and measure of the contents of a package may undergo slight changes from natural causes, it is also apparent that legislation requiring similar packages to contain the same exact quantity in terms of weight or measure, without allowing for any variation, would be destructive and prevent the putting of foods in packages." H. R. Rep. No. 850, *supra,* at 2; S. Rep. No. 1216, *supra,* at 2–3.

[29] See Hearings on Fair Packaging and Labeling before the House Committee on Interstate and Foreign Commerce, 89th Cong., 2d Sess., 208 (1966).

[30] It is clear from reading the legislative history that Congress did not intend to alter the FDCA's standard of accuracy when it passed the FPLA's requirement that a separate and accurate statement of net quantity appear in a uniform location on package labels, 15 U. S. C. § 1453 (a)(2). See, *e. g.,* H. R. Rep. No. 2076, 89th Cong., 2d Sess., 20 (1966) (chart indicating that only change from FDCA effected by provision which became § 1453 is imposition of location requirement).

subject to enforcement action for violation of the net-weight labeling requirements if the label accurately states the net weight, with allowance for the specified reasonable variations.

B. The FDCA contains no pre-emptive language. The FPLA, on the other hand, declares that

> "it is the express intent of Congress to supersede any and all laws of the States or political subdivisions thereof insofar as they may now or hereafter provide for the labeling of the net qua[nt]ity of contents of the package of any consumer commodity covered by this chapter which are less stringent than or require information different from the requirements of section 1453 of this title or regulations promulgated pursuant thereto." 15 U. S. C. § 1461.[31]

The Court of Appeals, although recognizing that this section leaves more scope for state law than does the FMIA, concluded that § 12211, as implemented by Art. 5, is pre-empted because it is less stringent than the Federal Acts, 530 F. 2d, at 1324–1327.

The basis for the Court of Appeals' holding is unclear. Its opinion may be read as based on the conclusion that the state law is inadequate because its enforcement relies on a statistical averaging procedure. We have rejected that conclusion. See *supra,* at 531, and n. 18. Alternatively, the Court of Appeals may have found California's approach less stringent because the State takes no enforcement action against lots whose

---

[31] Since we have held that 15 U. S. C. § 1453, read in conjunction with § 1460 and the FDCA, permits reasonable variations, we conclude that 21 CFR § 1.8b (q) (1976) properly relies on § 1453 as authority for its promulgation. Thus, § 1461 pre-empts state laws which "are less stringent than or require information different from" § 1.8b (q). We need not consider respondents' contention, Brief for Respondents 30, that § 1.8b (q) is authorized by 15 U. S. C. § 1454 (b), nor need we decide whether § 1461 would affect state laws less stringent than or different from regulations authorized by § 1454.

average net weight *exceeds* the weight stated on the label, even if that excess is not a reasonable variation attributable to a federally allowed cause.

We have some doubt that by pre-empting less stringent state laws, Congress intended to compel the States to expend scarce enforcement resources to prevent the sale of packages which contain more than the stated net weight. We do not have to reach that question, however, because in this respect California law apparently differs not at all from federal law, as applied. The inspectors responsible for enforcing the net-weight labeling provisions of the Federal Acts are officially informed that "[f]ield weighing for net weight is primarily to determine the likelihood of short weight units in the lots." Moreover, they are not required to submit samples to headquarters "if the average net is not below the amount declared on the label." Food and Drug Administration, Inspection Operations Manual 448.1, 448.13 (1976). These instructions undercut the argument that there is a federal interest in preventing packages from being overfilled.[32] Since neither jurisdiction is concerned with overweighting in the administration of its weights and measures laws, we cannot say that California's statutory lack of concern for that "problem"[33] makes its laws less stringent than the federal.

---

[32] Overweight packages are apparently also of no concern in the administration of the FMIA. See Meat and Poultry Inspection Manual, *supra*, n. 13, at 168–174. At oral argument, counsel for respondents was unable to cite any examples of federal enforcement action against overweight packages. See Tr. of Oral Arg. 49–50. To support his argument that federal law forbids overweighting, counsel relied on the argument made by the United States as *amicus curiae* in this litigation. The Government's brief in this Court also cites no examples of enforcement action based on overweighting and, although it refers generally to the inspection manuals cited here and in text, the brief makes no mention of the provisions to which we refer.

[33] The economic self-interest of packers is likely to prevent avoidable overpacking.

Respondents argue that California's law is pre-empted because it requires information different from that required by federal law. The meaning of the statutory pre-emption of laws that require "information different from" the federal net-weight labeling provisions, like the meaning of the phrase "less stringent," is unclear. Respondents attribute to the ban on requiring different information a broad meaning, similar in scope to the pre-emption provision of the FMIA. They contend that since California law requires the label to state the minimum net weight, it requires "information different from" the federal laws, which demand an accurate statement with allowance for the specified reasonable variations. Brief for Respondents 31–32. The legislative history, however, suggests that the statute expressly pre-empts as requiring "different information" only state laws governing net quantity labeling which impose requirements inconsistent with those imposed by federal law.[34] Since it would be possible to comply with the state law without triggering federal enforcement action we conclude that the state requirement is not inconsistent with federal law. We therefore hold that 15 U. S. C. § 1461 does not pre-empt California's § 12211 as implemented by Art. 5.

That holding does not, however, resolve this case, for we still must determine whether the state law "stands as an obstacle to the accomplishment and execution of the full

---

[34] The language of 15 U. S. C. § 1461 was contained in the House bill. The Senate bill, by contrast, provided for pre-emption of state requirements which "differ from" those in the FPLA. S. Rep. No. 1186, 89th Cong., 2d Sess., 38 (1966). The language accepted by the House was adopted by the conference committee, along with the House committee's explanation that

"preemption would take place to the extent that 'State laws or State regulations with respect to the labeling of net quantity of contents of packages impose inconsistent or less stringent requirements than are imposed under section 4 of this legislation.'" H. R. Rep. No. 2286, 89th Cong., 2d Sess., 11 (1966).

purposes and objectives of Congress." See *supra,* at 526. As Congress clearly stated, a major purpose of the FPLA is to facilitate value comparisons among similar products. Obviously, this goal cannot be accomplished unless packages that bear the same indicated weight in fact contain the same quantity of the product for which the consumer is paying. The significance of this requirement for our purposes results from the physical attributes of flour.

Flour is composed of flour solids and moisture. The average water content of wheat kernels used to make flour is 12.5% by weight, with a range from 10% to 14.5%. Efficient milling practice requires adding water to raise the moisture content to 15% to 16%; if the wheat is too wet or too dry, milling will be hindered. During milling, the moisture content is reduced to 13% to 14%. App. 28–29.[35]

The moisture content of flour does not remain constant after milling is completed. If the relative humidity of the atmosphere in which it is stored is greater than 60%, flour will gain moisture, and if the humidity is less than 60%, it will lose moisture.[36] The federal net-weight labeling standard permits variations from stated weight caused by this gain or loss of moisture.

Packages that meet the federal labeling requirements[37]

[35] The maximum allowable moisture content for any product labeled "flour" is 15%. 21 CFR § 15.1 (1976).

[36] App. 32–35. Weight fluctuations of 3% to 4% resulting from changes in moisture content are not uncommon during good distribution practice within the continental United States. *Id.,* at 32–33. The flour produced by respondent General Mills and ordered off the market by petitioner weighed, on the average, between 0.125% and 1.25% less than the stated weights. *Id.,* at 36.

If flour were packed in airtight packages in order to prevent weight fluctuations resulting from changes in moisture content, it would spoil. Tr. of Oral Arg. 39.

[37] It is undisputed that the packages of flour ordered off the market by petitioner complied with federal standards when packed. 530 F. 2d, at 1320; App. 36–37.

and that have the same stated quantity of contents can be expected to contain the same amount of flour solids.[38] Manufacturers will produce flour with a moisture content fixed by the requirements of the milling process.[39] Since manufacturers have reason not to pack significantly more than is required and federal law prohibits underpacking, they will pack the same amount of this similarly composed flour into packages of any given size.[40] Despite any changes in weight resulting from changes in moisture content during distribution, the packages will contain the same amount of flour solids when they reach the consumer. This identity of contents facilitates consumer value comparisons.

The State's refusal to permit reasonable weight variations resulting from loss of moisture during distribution produces a different effect.[41] In order to be certain of meeting the California standard, a miller must ensure that loss of moisture during distribution will not bring the weight of the contents below the stated weight. Local millers, which serve a limited area, could do so by adjusting their packing practices to the specific humidity conditions of their region. For example, a miller in an area where the humidity is typically higher than

---

[38] The nutritional value of a quantity of flour is determined by the amount of flour solids it contains. *Id.*, at 35.

[39] Although federal law would allow moisture content to be higher than that required by the milling process, see n. 35, *supra,* flour of the type involved in this case is not produced with moisture content as high as the law would permit. App. 30. Since manufacturers would have an economic incentive to produce flour with as close to the allowable maximum moisture content as milling technique permits, one would expect all flour to have virtually the same moisture content when packed.

[40] Unavoidable deviations resulting from the packing process will, of course, cause differences in the contents of individual packages. On the average, however, one would expect packages of a given size to contain the same amount.

[41] Since neither the State nor the Federal Government is concerned with overweighting, the absence of a state provision parallel to the federal recognition of weight gain from moisture is of no consequence.

60% would not need to overpack at all. By contrast, a miller with a national marketing area would not know the destination of its flour when it was packaged and would therefore have to assume that the flour would lose weight during distribution. The national manufacturer, therefore, would have to overpack.

Similarly, manufacturers who distributed only in States that followed the federal standard would not be concerned with compensating for possible moisture loss during distribution. National manufacturers who did not exclude the nonconforming States from their marketing area, on the other hand, would have to overpack. Thus, as a result of the application of the California standard, consumers throughout the country who attempted to compare the value of identically labeled packages of flour would not be comparing packages which contained identical amounts of flour solids. Value comparisons which did not account for this difference—and there would be no way for the consumer to make the necessary calculations—would be misleading.

We therefore conclude that with respect to the millers' flour, enforcement of § 12211, as implemented by Art. 5, would prevent "the accomplishment and execution of the full purposes and objectives of Congress" in passing the FPLA. Under the Constitution, that result is impermissible, and the state law must yield to the federal.

The judgments are affirmed.

*It is so ordered.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

I agree that with respect to Rath's packaged bacon, § 12211 of the Cal. Bus. & Prof. Code and Art. 5 of 4 Cal. Admin. Code, c. 8, are pre-empted by the express pre-emptive provision of the Federal Meat Inspection Act, 21 U. S. C. § 678. I also agree that with respect to General Mills' flour, § 12211

and Art. 5 are not pre-empted by the express pre-emptive provision of the Fair Packaging and Labeling Act (FPLA), 15 U. S. C. § 1461. I am unable to agree, however, with the implicit pre-emption the Court finds with respect to the flour. This latter pre-emption is founded in unwarranted speculations that hardly rise to that clear demonstration of conflict that must exist before the mere existence of a federal law may be said to pre-empt state law operating in the same field.

With respect to labeling requirements for flour under the scheme contemplated by the FPLA in conjunction with the Federal Food, Drug, and Cosmetic Act, the Court determines that the state-law labeling requirements are neither "less stringent than" nor inconsistent with those federal requirements. This conclusion quite properly dictates the Court's holding that Congress has not expressly prohibited state regulation in this field. The remaining inquiry, then, is whether the two statutory schemes are in utter conflict.[1] As this Court noted in *Kelly* v. *Washington,* 302 U. S. 1, 10 (1937):

> "The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'"

See also *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, 156 (1942); *Askew* v. *American Waterways Operators, Inc.,* 411 U. S. 325, 337, 341 (1973). When we deal, as we do here, with congressional action "in a field which the States have traditionally occupied," the basic assumption from which pre-

---

[1] There is no contention that the subject of the regulation is in its "nature national, or admit[ting] only of one uniform system . . . ." *Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852). On the contrary, "the supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern." *Florida Avocado Growers* v. *Paul,* 373 U. S. 132, 144 (1963).

emption must be viewed is "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947); cf. *De Canas* v. *Bica,* 424 U. S. 351, 356 (1976). I am simply unable to find that this stringent standard has been met in this case.

The Court's opinion demonstrates that it is physically possible to comply with the state-law requirement "without triggering federal enforcement action," *ante,* at 540. This leads the Court to conclude that the "state requirement is not inconsistent with federal law." *Ibid.* It also must lead to the conclusion that this is not a case "where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142–143 (1963). Preemption, then, if it is to exist at all in this case, must exist because the operation of the state Act inexorably conflicts with the *purposes* underlying the Federal Act. The Court relies on the fact that one of the purposes of the FPLA is to "facilitate value comparisons" among consumers, 15 U. S. C. § 1451. But merely identifying a purpose is not enough; it must also be shown that the state law inevitably frustrates that purpose. As we but recently noted:

> "We must also be careful to distinguish those situations in which the concurrent exercise of a power by the Federal Government and the States or by the States alone *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise. 'It is not . . . a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a pre-existing right of [state] sovereignty.' The Federalist No. 32, p. 243 (B. Wright ed. 1961)." *Goldstein* v. *California,* 412 U. S. 546, 554–555 (1973) (emphasis in original).

Under the proper test, it is only

> "[i]f the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage* v. *Jones,* 225 U. S. 501, 533 (1912).

The Court's reliance on supposition and inference fails in two respects to demonstrate that respondents have carried their burden of demonstrating pre-emption. First, on the Court's own premises, there should be no finding of pre-emption. We are told, *ante,* at 526, that the relevant inquiry is "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written," while we are further told, *ante,* at 539, that there is, in fact, no "federal interest in preventing packages from being overfilled," since the Federal Government is not "concerned with overweighting in the administration of its weights and measures laws . . . ." Under these premises, it is hard to accept the Court's conclusion that, because of the federal purpose to facilitate consumer value comparisons,[2] the state law is pre-empted because some packages might contain more than the minimum weight stated and more than another company's similarly marked package. For, we have been told that, should a manufacturer deliberately overpack, for *whatever* reason,[3] there will be no federal action taken against him even though value comparisons might then "be misleading." It is virtually impossible to say, as the Court does, that "neither the State nor the Federal Government is concerned with over-

---

[2] This purpose is not the only purpose underlying the Federal Act. Title 15 U. S. C. § 1451 also announces the congressional policy of labeling packages so as to "enable consumers to obtain accurate information as to the quantity of the contents . . . ."

[3] Including, one would have supposed, state compulsion.

weighting," *ante,* at 542 n. 41, and yet conclude that state-induced overweighting conflicts with a "value comparison" purpose, while, presumably, other overweighting does not. In viewing such a purpose to be sufficient to require pre-emption while the very purpose is ignored in practice by the administering federal agency reverses the normal presumption against finding pre-emption. The reasoning process which leads the Court to conclude that there is no express pre-emption, *ante,* at 540, leads me to conclude that there is no implied pre-emption.[4]

Second, and as troubling as the legal inconsistency, is the Court's reliance on unproved factual speculation in demonstrating the purported irreconcilable undermining of the federal purpose by the state statutory scheme. The premises the opinion must rely on are many. It acknowledges that flour packed under different humidity conditions would nonetheless comply with the federal standard, even though, as a result, similarly marked packages might contain different quantities of flour "solids," *ante,* at 542, and n. 39, but relies on the economics of the milling process to conclude that packers "will pack the same amount of [flour solids] into packages of any given size." This may normally be true as an economic fact, but it is not supported by the record and as a Court we have no way of knowing it from other sources.

Similarly defective is the reasoning process by which the majority concludes that local millers could adjust their packaging practices to specific humidity conditions, while national millers could not, since the national millers "would not know the destination of [their] flour when it was packaged and would therefore have to assume that the flour would lose weight during distribution." *Ante,* at 543. This assump-

---

[4] The majority nowhere explains why its conclusion that the "state requirement is not inconsistent with federal law," *ante,* at 540, does not reflect on the fact that the state statutory scheme does not inevitably conflict with the federal.

tion, too, is unsupported by the record.[5] We simply have no basis for concluding that national distributors do not know, or could not know through the exertion of some modicum of effort, where their flour will end up. The possibility that a packer might have to incur some extra expense in meeting both systems simply does not mean that the "purposes of the act cannot otherwise be accomplished," *Savage* v. *Jones,* 225 U. S., at 533, nor does it demonstrate that "the two acts cannot 'be reconciled . . . ,'" *Kelly* v. *Washington,* 302 U. S., at 10.[6]

---

[5] The Court's reliance on the possible differential effect of California's requirements on local and national millers is itself wholly speculative. To begin with, we do not know from the record that there are both "local" and "national" millers, however defined. Even if both exist, we simply do not know that local millers will ship flour only to areas with comparable humidity levels. Any miller might experience a variety of humidity conditions by shipping to two different areas, despite the fact that his operation may be considered local in that the two areas are relatively contiguous. Even in the same town, stores that are air-conditioned may have significantly different humidity conditions than exist elsewhere in the town. In such situations, the local millers would have to adjust their packing process to account for this differential, either by packing different quantities into different packages, and then tracing their distribution, or by overpacking all packages sufficiently to ensure that any possible humidity conditions could be met. The same would appear to be true for national millers. We simply, then, do not know that local millers and national millers would not be similarly affected. The Court's assertions to the contrary are nothing but speculations.

[6] For all that appears, packers could easily adjust their processes so as to insure compliance with the purposes of both Acts. Even if such adjustment should entail a minor economic inconvenience, it has nowhere been demonstrated that the imposition of a moderate economic burden conflicts with the purpose of the federal statutory scheme. California, in the exercise of its police powers, may be deemed to have believed that the benefits of its enactment outweigh these costs. Unless it can be shown that additional cost itself conflicts with a clear congressional purpose, the presumption is that our federal system of government tolerates such costs. And if added costs will vitiate the conflict, I do not see how it can be said that the statutory schemes necessarily conflict rather than

The assumptions in the Court's opinion not only are insufficient to compel a finding of implied pre-emption, they suggest an approach to the question of pre-emption wholly at odds with that enunciated in *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132 (1963). There, this Court was concerned with differing federal and state maturity standards for avocados grown in Florida. This Court rejected a test which looked to the similarity of purposes, *id.,* at 142, and noted instead that a manufacturer could have complied with both statutes by modifying procedures somewhat, *id.,* at 143, which demonstrated that there was "no inevitable collision between the two schemes of regulation, despite the dissimilarity of the standards," *ibid.* Nothing has been shown to demonstrate that this conclusion is not equally justified in the instant case.

The Court today demonstrates only that there could be—not that there must be—a conflict between state and federal laws.[7] Because reliance on this test to find pre-emption, absent an explicit pre-emptive clause, seriously misapprehends the carefully delimited nature of the doctrine of pre-emption, *Goldstein* v. *California,* 412 U. S., at 554, I dissent from the holding that § 12211 and Art. 5 are pre-empted with respect to General Mills' flour.

---

just "may possibly" conflict. *Goldstein* v. *California,* 412 U. S. 546, 554 (1973).

[7] On its face, there is nothing inexorable about a conflict between a statute which, in effect, imposes a minimum weight requirement, and one whose purpose is to "enable consumers to obtain accurate information as to the quantity of the contents and [to] facilitate value comparisons." 15 U. S. C. § 1451.