VILLAGE OF PINE RUN, PETITIONER-APPELLANT, v. SOUTH JERSEY GAS COMPANY AND BOARD OF PUBLIC UTILITIES, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 19, 1986—Decided February 4, 1987.

Before Judges KING, DEIGHAN and MUIR.

*Robert A. Vort* argued the cause on behalf of appellant (*Kirsten, Friedman & Cherin,* attorneys; *Robert Vort, Dennis C. Linken* and *John K. Enright* on the brief).

*Ira G. Megdal* argued the cause on behalf of respondent South Jersey Gas Co. (*Davis, Reberkenny & Abramowitz,* attorneys; *Ira Megdal* and *David R. Oberlander* on the brief).

*Judith B. Appel,* Deputy Attorney General, argued the cause on behalf of respondent Board of Public Utilities (*W. Cary Edwards,* Attorney General, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel, and *Antoinette Bennett,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MUIR, J.A.D.

Petitioner Village of Pine Run appeals from a Board of Public Utility's decision which adopted an Administrative Law Judge's determination that Respondent South Jersey Gas Company properly refrained from undertaking individual gas service metering at petitioner's apartment complex in Gloucestor Township. Petitioner contended before the ALJ that respondent violated (1) *N.J.S.A.* 48:3–2 by adopting unreasonable regulations, (2) *N.J.S.A.* 48:3–3 by withholding reasonably demanded service, and (3) *N.J.S.A.* 48:3–4 by subjecting petitioner to undue prejudice or disadvantage.

The BPU, in adopting the ALJ's decision, stated:

> The Board concurs with the Administrative Law Judge's findings that South Jersey properly refrained from undertaking individual gas service metering at the Pine Run apartment complex because of the numerous safety questions which remain unresolved. The Board agrees with the company's contention that the issues of safety are a permanent concern and in this case transcend conservation savings which normally follow the conversion from master to individual metering.

The controversy between the parties centered on the transmission lines used to provide natural gas to petitioner's apartment. Service lines, those lines before the customer's meter, are the responsibility of the utility. Fuel lines, those lines downstream or after the meter, are the responsibility of the customer. Conversion to individual metering, by the fact that it moved the meters to points downstream from the prior master meter location, converted fuel lines to service lines.

Petitioner, being responsible for the cost of any conversion, sought to have the respondent take over the existing fuel lines

which became service lines by virtue of the conversion. Respondent refused to do so unless the petitioner upgraded the fuel lines to meet respondent's safety standards, which are higher or more restrictive than existing federal or state requirements.

On appeal, petitioner abandons the challenge raised before the ALJ. It concedes the ALJ's findings and conclusions adopted by the BPU. Instead, petitioner now argues the respondent may not set higher safety standards than the minimum federal pipeline safety standards set by regulations of the U.S. Department of Transportation adopted pursuant to the Natural Gas Pipeline Safety Act of 1968, 49 *U.S.C.A.* § 1671 *et seq.* (West 1976).

It argues that the minimum standards are binding on respondent, that only the BPU can enact more stringent standards and that in allowing respondent to utilize more stringent standards the BPU delegated its rule-making power to the respondent in violation of the Administrative Procedures Act. *N.J. S.A.* 52:14B-1 *et seq.*

Petitioner, a cartel of four limited partnerships with one man as a general partner of each, owns a 699–apartment complex. The complex has 177 townhouse-styled apartments that are individually metered. It also has 522 traditionally styled apartments that are currently master metered. Petitioner seeks to convert these units to individual metering.

All 522 units and buildings in which they are located are provided natural gas in the same manner. A service line runs from the street to the master meter. Fuel lines then leave the meter, go into the ground and go through the foundation wall of the apartment building into a laundry room where there are hot water heaters and clothes dryers. The fuel lines then run through a crawl space (except for a dozen buildings which have no crawl space with lines apparently running under the floor) and branch off to apartment gas ranges. From there, the fuel lines extend through another crawl space to the rear of the

building where they branch off to heating units in the apartments.

The ALJ made the following findings with respect to the fuel lines:

14. The respondent has a policy not to accept fuel lines as service lines.

15. The respondent has a policy requiring welded joints on service lines.

16. The respondent has a policy to encase lines running through buildings.

.   .   .   .   .   .   .   .

21. The actual layout of the piping does not follow a consistent design from one building to the next.

22. Neither the petitioner nor the respondent knows who installed existing lines or specification to which the lines were installed.

23. The existing lines have screw-threaded joints rather than welded joints.

24. It is not known whether the threaded portions of the couplings are tapered or straight.

25. It is not known whether the joints have pipe dope which is essential to creating a proper seal at the joints.

26. There is some corrosion on the pipes, but the depth of the corrosion is not known.

.   .   .   .   .   .   .   .

28. Respondent is primarily concerned about external, rather than internal, pressure such as settling of the building which could cause a leak at a joint.

29. The types of couplings used at inaccessible locations are not known.

30. The existing lines inside the buildings are not encased.

31. The pipes in several of the laundry rooms run along the floor where they are exposed to water and detergent which could cause corrosion.

32. In other laundry rooms, the pipes are covered with concrete or dirt which could cause corrosion.

33. When first inspected by respondent's personnel, the crawl spaces contained litter and debris and were as shallow as 16 inches.

34. Other crawl spaces were wet from air conditioner condensate and ground water.

35. Prior to hearing, the petitioner caused the crawl spaces to be cleaned and excavated to a minimum depth of 22 inches.

36. The crawl spaces have poor ventilation, and gas could pocket there.

37. The lines in the crawl spaces are poorly hung.

---

1Numbers represent individual findings set out in ALJ's opinion.

38. The lines would be difficult to maintain because of the limited depth of the crawl spaces.

39. The entrance to most of the crawl spaces is through a pit.

40. No leaks in the existing piping have been reported.

41. The existing lines are not presently in compliance with federal minimum standards.

42. The existing lines are not in compliance with the higher safety standards established by company policy.

Petitioner proposed a conversion plan that would have respondent reuse, as service lines, 80% of the fuel lines. Respondent made two alternative proposals, both of which would require the installation of new lines upgrading the safety standards of the lines.

The cost of petitioner's proposal is unknown. The costs of respondent's proposals are $236,000 and $263,000. Both, according to the ALJ, would "probably" exceed petitioner's plan.

I

Petitioner's first contention essentially is that the Natural Gas Pipeline Safety Act, 49 *U.S.C.A.* § 1671 *et seq.* authorizes only the Federal Department of Transportation or the state, by the BPU, to set safety standards for gas transmission. It reasons in absence of authorization by Congress that respondent cannot set its own more restrictive safety standards.

49 *U.S.C.A.* § 1672(a) provides, in its pertinent parts:

(1) The Secretary [of the Department of Transportation] shall, by regulation, establish minimum Federal safety standards for the transportation of gas and pipe line facilities. Such standards may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities.

. . . . . . . .

Any State agency may adopt additional or more stringent safety standards for intrastate pipeline transportation if such standards are compatible with the Federal minimum standards.

The Congress enacted the Safety Act in response to the need for Federal regulation of gas transmission in the interest of greater public safety. 1968 *U.S. Code Cong. and Admin.News*

3232. It did so recognizing that states had an interest in establishing safety standards for gas transmission. *Id.* at 3228.

The House Report and Conference report on the Act noted the authority of the states to impose more stringent safety standards for intrastate pipelines. *Id.* at 3236. It also pointed out that due to preemption the standards for interstate lines would also be the Federal standards but that the legislation prescribed a role for state enforcement of local pipeline safety standards. *Id.* at 3241.

The Department of Transportation adopted regulations establishing minimum Federal standards. 35 Fed.Reg. 13,248 (1970) (to be codified at 49 C.F.R. pt. 192) (proposed between Nov. 14, 1969 and June 10, 1970). In doing so, it made the following statement:

*Federal Regulation as a minimum standard.* The scope provision of these regulations state that they prescribe the *minimum* safety standards. Though some commenters objected to the word "minimum," it has been retained. Under the Natural Gas Pipeline Safety Act, these are in fact minimum standards. With respect to interstate facilities under Federal jurisdiction, an operator may voluntarily exceed these standards. With respect to intrastate facilities under State jurisdiction, an operator [public utility] may voluntarily exceed these standards. [*Id.* at 13,250].

We conclude from the foregoing and the word "minimum" in the Federal legislation that a public utility, as operator of gas transmission facilities, may adopt safety standards that exceed the Federal standards promulgated by the Federal Department of Transportation.

The legislative history reflects the concern of Congress for safety in gas transmission pipelines. In the interest of public safety it promulgated minimum standards. Minimum implies the basic or lowest standard. It does not encompass greater or maximum standards. It did not preclude implementation of higher safety standards by public utilities. The legislative history reflects preemption only as to minimum standards in interstate gas transmission. The congressional command for pre-emptive effect of legislation may be "explicitly stated in the statute's language or implicitly contained in its structure or

purpose." *Jones v. Rath Packing Co.,* 430 *U.S.* 519, 525, 97 *S.Ct.* 1305, 1308, 51 *L.Ed.*2d 604, 614 (1977). We find no such explicit or implicit expression.

That the Federal legislation did not preclude more restrictive safety standards being imposed by operating utilities is reflected in the statement of the Federal Department of Transportation at the time it promulgated the minimum standards. The statement that operators may impose more restrictive standards in both interstate and intrastate gas transmission is entitled to great weight. The opinion as to construction of a regulatory statute by the administrative agency charged with enforcement of that statute is a substantial factor to be considered in construing the statute. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 575 (1978).

Furthermore, logic belies petitioner's reasoning that the utility cannot impose its own higher safety standards. Congress adopted the National Pipeline Safety Act in the interest of greater public safety. Greater public safety will be enhanced if utilities adopt higher, more restrictive safety standards for their gas transmission lines than are required by the federal minimum standards. Consequently, the congressional goal is furthered by such a course of conduct on the part of utilities. The findings of the ALJ highlight the inadequacy of petitioner's existing fuel lines and their non-compliance with the federal minimum standards. Upgrading to respondent's standard can only enure to the benefit of the public, in this case the apartment dwellers.

Accordingly, we conclude the respondent could compel petitioner, in order to convert its apartments to individually metered units, to install lines that met more restrictive safety standards than those required by regulations promulgated pursuant to 49 *U.S.C.A.* § 1671 *et seq.*

## II.

Our holding proscribes the necessity to rule on petitioner's remaining contentions. Respondent's adoption of higher, more

restrictive safety standards for gas transmission lines, in this instance, is outside the aura of the administrative process. Authority delegated to an administrative agency to be implemented through rulemaking or adjudicatory power is not involved. *See Crema v. New Jersey Dept. of Environmental Protection,* 94 *N.J.* 286, 299 (1983).

Affirmed.