CHAMBER OF COMMERCE OF the
UNITED STATES et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE et al., Defendants.

Civ. A. No. 78–1515.

United States District Court,
District of Columbia.

Oct. 10, 1978.

James F. Rill, Philip C. Olsson, Richard E. Schwartz, Kathleen McDermott, Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., for plaintiffs.

Mary A. McReynolds, U. S. Dept. of Justice, Washington, D. C., for United States Dept. of Agriculture.

Charles E. Hill, Charles R. Halpern, Washington, D. C., for defendant Consumer Federation of America.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court on plaintiffs' motion for a preliminary injunction, opposed by defendants. It presents a significant question of administrative law: whether in the absence of explicit statutory authority a federal agency can fund a study by a consumer group of the probable impact of proposed rules upon consumers. The court believes it can, and will deny the motion for a preliminary injunction.

Plaintiffs, The American Meat Institute (AMI) and the National Broiler Council (NBC) are composed primarily of packers and processors of meat and poultry products who are regulated by the Department of Agriculture. They are members of plaintiff Chamber of Commerce of the United States. Plaintiff Citizen's Choice characterizes itself as a voluntary association of consumers of meat and poultry products, opposed to federal regulations that increase the cost of meat and poultry products without commensurate benefit. The defendants are the United States Department of Agriculture (USDA) and the Consumer Federation of America (CFA), a consumer-oriented advocacy organization.

Plaintiffs seek to enjoin the USDA from paying for, using, receiving or considering a study which would be provided by the CFA pursuant to a contract entered into in June, 1978. The study would analyze the economic impact, particularly on consumers, of regulations presently under consideration by the Department of Agriculture. It is plaintiff's position that the contract was illegally entered into and that the contract constitutes arbitrary and capricious preference of one participant over another in a rulemaking proceeding. The defendants contend that the contract is entirely legal, that it was issued pursuant to USDA's implied powers, and that even if it constitutes a certain amount of preference, the preference is only proper to redress a long-standing imbalance between industry and consumer representation in federal regulatory proceedings.

## FACTUAL BACKGROUND

The USDA is empowered by Congress to regulate the quality of meat and poultry products. The Department enforces the Federal Meat Inspection Act, 21 U.S.C. §§ 601–95 (1976), and the Federal Poultry Inspection Act, 21 U.S.C. §§ 451–70 (1976). Pursuant to these Acts it has the authority to prohibit the misbranding of poultry products, 21 U.S.C. §§ 457(b), 458(a)(2), the misbranding of meat products, 21 U.S.C. §§ 607(b), (c), and to issue regulations governing the net weight of poultry and meat products including provisions for reasonable variations between stated and actual weight. 21 U.S.C. §§ 453(h)(5), 601(n)(5). One aspect of this regulation is the setting of standards for permissible variations in weight caused by moisture loss, shrinkage during handling, and other causes between the time of packing and the time of retail

sale. Because recent litigation[1] made it appear that existing federal standards inadequately address the problem of shrinkage during distribution, the USDA has been engaged in informal rulemaking to establish standards. In September, 1977, the USDA received a petition requesting stricter standards in the weight of meat and poultry products and less variation in a given lot.[2] Proposed regulations were issued on December 2, 1977; they are substantially stricter than the previous federal standards.[3] Plaintiffs in this action have consistently opposed these rules, contending that they are economically unsound and extremely difficult to comply with without overpacking. The USDA provided a comment period of ninety days for interested persons to file submissions.

In the course of a hearing on February 9, 1978, the USDA learned that several industry groups were planning to test moisture loss to determine how much overpacking would be required to comply with the proposed standards. At the hearing several parties, including the AMI and the NBC, requested a six-month extension of the comment period, until September 2, 1978. The USDA denied these requests, although it did grant a three-month extension until June 2, 1978. A subsequent request for an extension was denied. The AMI and the NBC both submitted moisture loss studies within the prescribed period, although both contend that the results could have been considerably more complete had they received a longer extension.

Also in early February, a review by the USDA of the comments on file indicated that insufficient data existed with respect to the economic impact of the existing and proposed regulations. *Foreman affidavit* ¶ 15. Department officials expected that industry submissions would be limited to the impact upon industry. Consequently, on March 27, 1978, the USDA announced that it wished to receive bids on a "Study to Provide an Analysis of the Impact on Consumers of Proposed Regulations on Net Weight Labeling."[4] The bids were to be limited to $10,000 or less, and the study was to be completed by June 2, 1978. The "request for bids" notice stated:

> The Food Safety and Quality Service feels that the issues surrounding the proposed action on net weights are of such importance to consumers that a comprehensive picture of consumer benefits and cost resulting from implementation of this proposal should be developed. Since consumer-oriented organizations are faced with chronic shortages of money and personnel, they are not able to garner the resources required for in-depth investigations on every issue they might wish to pursue. In the case of net weight regulations, detailed input from industry and the USDA has been made available to the Agency. However, the consumer perspective has not been given the attention essential to creating a fair and effective balance among the views of interest-

---

1. See *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Rath Packing Co. v. Becker*, 530 F.2d 1295 (9th Cir. 1975).

2. The original petition came from the State of California, which had attempted to establish stricter standards for net weight variation, only to find its regulations preempted by federal standards. Affidavit of Carol Tucker Foreman, Ass't Sec. of Agr. for Food & Consumer Serv. ¶ 10; see *Rath Packing Co. v. Becker, supra*, 530 F.2d at 1312–14 (state imposed labeling standards different from federal standards are unenforceable), *aff'd*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

   The petition drew the support of 48 states, the District of Columbia, and numerous consumer organizations. *Foreman Aff.* ¶ 10.

3. The principal features of the proposed rule are that the stated net weight cannot include moisture lost between packaging and retail; that individual items within a given lot may vary from the stated weight only within narrower limits than previously allowed, and that the average weight of an entire lot must equal the stated weight. 42 *Fed.Reg.* 55227 (1977).

4. The study was to focus on the following areas: (1) Consumer costs without the proposed net weight labeling controls; (2) Consumer costs with the proposed controls; (3) Benefits to consumers and industry resulting from the current system; (4) Benefits to consumers and industry resulting from the proposed system; (5) Alternatives to both systems, and (6) Other short and long-run consumer impacts which FSQS should take into account.

ed parties. The study described above would correct this deficiency—allowing FSQS to conduct its final net weight deliberations on the basis of complete and well-rounded information regarding anticipated impacts.

In a subsequent memorandum, the Food Safety and Quality Service (FSQS) was asked to change the bid request to indicate that FSQS only wanted bids from "recognized consumer advocacy organizations".[5] FSQS officials refused to add this language, characterizing it as overly restrictive.[6]

The request was sent to the Commerce Business Daily on March 20, 1978. Fifty-one vendors responded and received copies of the bid request. In addition, the FSQS sent a request for quotation to ten organizations (including five consumer groups) thought to be both capable of and interested in the study.

The initial request produced only one bid, however, for $60,000.00. The USDA rejected this bid on May 18, 1978. On May 17, however, the Consumer Federation of America (CFA) had submitted a proposal to conduct an impact study of the proposed regulations. The contract was awarded to CFA on June 7, 1978, with an August 31 completion date and a price of $23,536.

The record is replete with plaintiffs' allegations concerning alleged improprieties committed by USDA officials, especially Assistant Secretary Foreman,[7] in contracting with the CFA. Upon a review of the record, it is evident that CFA received 90 days to complete the study, while the original proposal allowed only 30 days for completion; that CFA was promised over $23,-000 although the original bid proposal specified a maximum bid of $10,000; and that CFA received the vigorous support of Assistant Secretary Foreman, who stated on numerous occasions that the CFA was qualified to perform the study. The court notes, however, that by the time CFA was contacted, the USDA was attempting to procure the needed study under its negotiation authority, rather than by bids, as permitted by federal procurement regulations. Moreover, the USDA Inspector General conducted an investigation at the request of industry representatives and concluded:

> Our review revealed no improper action by Assistant Secretary Foreman. We did note certain inadequacies in the FSQS procurement process, particularly with respect to record keeping. We do not believe they warranted cancellation of the contract and that was not recommended.

The above findings of fact can be reduced to several significant propositions. First, the Department of Agriculture made significant efforts to obtain and fund the views of a consumer-oriented group. Second, this selective approach violated no federal procurement statute or regulation. Finally, after selecting the CFA for the study the USDA effectively extended the comment period for CFA while denying the plaintiffs similar extensions of time.[8]

## CONCLUSIONS OF LAW

Before moving to the merits of plaintiffs' motion for a preliminary injunction, the court must address two jurisdictional defenses raised by defendants: standing and ripeness.

---

5. The subsequent memorandum would have added the following to the original notice:

   FSQS is seeking bids for a study of this proposal from recognized consumer advocacy organizations. The bid should indicate the organization's demonstrated ability to provide or procure the services and expertise necessary to perform the analysis within the established time frame.

6. The Director of the Administrative Services Division characterized the additional two lines as restrictive and therefore illegal. He also pointed out the difficulties of determining whether a given bidder was a "recognized consumer advocacy organization."

7. Ms. Foreman was the Executive Director of the CFA before joining the USDA.

8. The USDA contends that the comment period was not extended because the CFA was merely conducting a "technical study". Plaintiffs, however, also wished to conduct "technical studies" of their own. Moreover, experience with the advocacy process has convinced the court that any given set of facts or statistics can be presented in numerous ways.

Defendants contend that plaintiffs lack standing to bring this action because plaintiffs have demonstrated neither "a distinct and palpable injury" from the action challenged nor a "fairly traceable" causal connection between the challenged conduct and the claimed injury. These two requirements are the well-established guidelines for determining if a party has standing to sue in the federal courts. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, —— U.S. ——, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ The court concludes, however, that plaintiffs have standing. They are producers and consumers of meat and poultry products, and at least the producers are regulated by the USDA to a substantial degree. Sweeping changes in permissible weight variations directly affect the economic viability of their businesses. Their allegation is not that the USDA is promulgating regulations, but that it is doing so illegally—by funding the submissions of an organization opposed to plaintiffs' views and by according greater weight to CFA views than it gave to plaintiffs' views. The injury alleged is therefore both substantial and pecuniary, and a direct result of the allegedly illegal action. Here it can be said that the alleged injury "fairly can be traced to the challenged action of the defendant, and [not from] the independent action of some third party." *Simon v. Eastern Ky. Welfare Rights Org., supra*, 426 U.S. at 41–42, 96 S.Ct. at 1926.

■ The court also rejects the contention that this case is not ripe for judicial review. The facts are relatively clear, and they will not be further illuminated by continuing agency action, in the rulemaking proceeding or otherwise. The issue is legal rather than factual. Plaintiffs have alleged the possibility of immediate harm, and although this alleged harm may not be substantial enough to call for the injunctive relief requested, it is enough to provide an issue for the court to review. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ Turning to the merits of the preliminary injunction, the court refers to the familiar test set forth in *Virginia Petroleum Jobbers Assoc. v. FPC* 104 U.S.App.D.C. 106, 259 F.2d 921 (1968); as reiterated in *Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc.*, 182 U.S.App. D.C. 220, 559 F.2d 841 (1977):

(1) Whether petitioner is likely to prevail at trial on the merits;

(2) Whether petitioner will be irreparably injured unless the requested relief is granted;

(3) Whether granting the relief requested would substantially harm other parties interested in the proceeding; and

(4) Whether the relief requested is in the public interest.

*Likelihood of Success on the Merits*

The plaintiffs' case rests on two theories: first, that the USDA lacks the authority to fund participation in rulemaking, regardless of the need for the information; second, that the USDA discriminated against the plaintiffs by extending the comment period for CFA while discriminating against industry. In neither situation is plaintiff likely to prevail on the merits.

Plaintiffs rely primarily on *Greene County Planning Board v. FPC*, 559 F.2d 1227 (2d Cir. 1977) (en banc), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), for the proposition that absent specific legislation, the USDA cannot subsidize any person's participation in rulemaking. This misconstrues the holding of *Greene County*. In that case the Federal Power Commission had rejected a request to award legal fees to a successful intervenor in adjudicatory proceedings. The United States Court of Appeals for the Second Circuit, although stating that an agency can only fund participation when authorized by statute to do so, placed great weight on the FPC's construction of its statute and on the

FPC's explicit distaste for funding intervenors. *Id.* at 1239 n. 2.

In this case the USDA determined that a consumer perspective was required to supplement the numerous comments received during the net weight rulemaking comment period. The USDA considered itself empowered to spend money on consumer representation.

■ This court does not quarrel with the statement in *Greene* that "[t]he authority of a Commission to disburse funds must come from Congress." *Id.* at 1239; *see Turner v. FCC*, 169 U.S.App.D.C. 113, 115, 514 F.2d 1354, 1356 (1975).[9] The court does feel, however, that numerous authorities support the conclusion that agencies in general, and the USDA in particular, have the implied power voluntarily to fund the views of parties whose petition might otherwise go unrepresented.

■ First, numerous courts have held that federal agencies have implied powers to expend funds and take other efforts to meet their statutory responsibilities. *Pan American World Airways v. United States*, 371 U.S. 296, 311–13, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (CAB authority to issue "cease and desist" order includes implied power to order divestiture); *United States v. Pennsylvania Railroad Co.*, 323 U.S. 612, 615–16, 65 S.Ct. 471, 89 L.Ed. 499 (1945) (ICC authority to require establishment of through rail-water routes implied from "general" Congressional language); *Lehigh & New England Railroad Co. v. ICC*, 540 F.2d 71, 78–79 (3d Cir. 1976) (ICC authority to determine reimbursable costs is "fairly implied"), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50

L.Ed.2d 776 (1977); *Soriano v. United States*, 494 F.2d 681 (9th Cir. 1974) (agencies have expressly granted powers and those implied therefrom); *Morrow v. Clayton*, 326 F.2d 36, 43–44 (10th Cir. 1963) (USDA power to administratively cancel acreage allotments implied although not provided for in statute). Thus, it may be fairly said that "[i]n the construction of a grant of powers, it is a general principle of law that where the end is required the appropriate means are given and that every grant of power carries with it the use of necessary and lawful means for its effective execution." 1 Am.Jur.2d, Administrative Law § 44, at 846 (1962). Our own Court of Appeals has hewed to this view, stating in *Niagara Mohawk Power Corp. v. FPC*, 126 U.S.App.D.C. 376, 380–381, 379 F.2d 153, 157–58 (1967) that the FPC had the power to issue project licenses with an effective date earlier than the date of issuance. The court reasoned:

> The Act is not to be given a tight reading wherein every action of the Commission is justified only if referable to express statutory authorization. On the contrary, the Act is one that entrusts a broad subject-matter to administration by the Commission, subject to Congressional oversight, in the light of new and evolving problems and doctrines.

*Id.* 126 U.S.App.D.C. at 381, 379 F.2d at 158. Moreover,

> While [the] "necessary or appropriate" provisions [of the Federal Power Act] do not have the same majesty and breadth in statutes as in a constitution, there is no dearth of decisions making clear that they are not restricted to procedural mi-

---

**9.** Both *Turner* and *Greene County* involved attempts by parties to adjudicative proceedings to compel the reimbursement of fees expended during the course of adjudication. These cases are fundamentally distinguishable from the present case, as is the recent Supreme Court "fee shifting" case, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The latter involved an attempt by a prevailing litigant to collect legal fees from the losing party, which would penalize parties who have elected in good faith to prosecute or defend a suit. *Id.* at 262, 95 S.Ct. 1612; *see* 66 Geo.L.J. 931, 944

(1978). Similarly, compelling an agency to reimburse fees when it believes it lacks the power or that an intervening party does not deserve reimbursement might stifle the agency's willingness to allow intervention or lead to unnecessary intervention by parties more interested in fees than in advancing a meritorious viewpoint. The present case, by contrast, involves a determination by agency officials that they have the power to fund public participation in rulemaking, a determination that a consumer perspective on the proposed rules was necessary and desirable, and a limited expenditure of funds to achieve that purpose.

nutae, and that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.

*Id.*

The Department of Agriculture possesses broad powers under the Wholesome Meat Act, 21 U.S.C. §§ 601–695 (1976), and the Wholesome Poultry Products Act, 21 U.S.C. §§ 451–470 (1976), to regulate the proper preparation of meat and poultry products. This includes the power to make rules concerning net weight labelling, *see* 21 U.S.C. §§ 453(h)(5), 601(n)(5), and the power to expend "such sums as are necessary to carry out the provisions" of the Acts. 21 U.S.C. §§ 469, 680. The USDA's position in this lawsuit is that these powers include the power to expend funds to obtain information not otherwise available. The court gives deference to the agency interpretation of its own statute and cannot say the interpretation is wrong as a matter of law. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Several other factors support the interpretation taken by the USDA. The Comptroller General has taken the position that certain agencies may provide financial assistance to organizations that cannot afford to participate in proceedings but whose participation is deemed necessary to full and fair proceedings. *Matter of Costs of Intervention, Nuclear Regulatory Commission*, No. B–92288 (February 19, 1976) (unpublished). The Comptroller reasoned that the Nuclear Regulatory Commission had a statutory duty to "grant a hearing" to interested parties, and that the NRC appropriations

authorized spending "for necessary expenses". Basically, if the Commission needs the information and a prospective intervenor needs the funds, the Commission may in its discretion "grant a hearing" by providing the necessary funds. Moreover, the Comptroller has determined that this rationale applies to nine different agencies.[10] The Department of Justice has also taken the position that the *Greene County* decision does not preclude federal agencies from determining whether they have explicit or implicit statutory authority to recompense fees and expenses of party intervenors.[11]

Thus the court finds that plaintiffs are not likely to prevail on the merits with a claim that the USDA lacks the authority to fund public participation in rulemaking proceedings.

This leaves plaintiffs' claim that the USDA discriminated against them by extending the period for completion of the CFA study from June 2, 1978 to August 31, 1978 while refusing to allow the industry representatives any additional time beyond June 2, to comment on the proposed regulations. Although this discriminatory act would ordinarily not be countenanced, the USDA has in this case assured the court that it will reopen the comment period if the CFA study turns up information substantially different from the position taken by industry. The court can presume that the USDA makes this promise in good faith. Thus, it would appear that because there is still time to cure this administrative defect, plaintiffs are unlikely to succeed on the merits with a claim of discrimination.

*Possibility of Irreparable Harm to Plaintiffs.*

Plaintiffs allege that they will be irreparably harmed if the injunction is denied in

10. Letter from R. F. Keller, Deputy Comptroller, to Congressman John E. Moss, May 10, 1976. (No. B–180224). It is apparent from the context of the letter that Congressman Moss only inquired about the legality of funding with respect to the nine agencies mentioned. Thus, the failure to include the USDA among the nine does not amount to an implicit statement that

the USDA lacks the authority to fund public participation.

11. Letter from John Harmon, Ass't Att'y Gen., U. S. Dep't of Justice, to Linda Heller Kamm, General Counsel, Dep't of Transportation, March 1, 1978.

that they will be obligated to spend money or risk adoption of CFA's viewpoint. They also allege that if the proposed rule is adopted, it will cause irreparable economic injury to the industry. Finally, they argue that they have had to spend money to participate in the rulemaking while the CFA has not, and that this amounts to irreparable injury.

The court finds, however, that even if the CFA study reaches conclusions opposed to those of plaintiffs, the harm to plaintiffs will not be irreparable. First, plaintiffs voluntarily assumed the burden of spending money to participate in rulemaking proceedings, so that their own views would be represented. They can hardly complain if the USDA, in order to obtain a balanced picture, funds a single study for a single consumer group. Second, the adoption of the proposed rules might cause injury to plaintiffs' business interests, but it is hardly an irreparable injury flowing directly from CFA participation in this rulemaking. The USDA had adopted a stricter position with regard to "permissible variations" in the retail weight of meat and poultry products long before the CFA entered the picture. These stricter rules had their origins in petitions by 48 states and numerous local entities, who amply support the USDA's decision to promulgate stricter rules. It is simply unsupportable for plaintiffs, with claims of subterfuge by USDA officials, to state that the CFA study by itself will result in rules opposed by plaintiffs. The claim of "taint" cannot stand up under close scrutiny.

*Injury to Other Parties if the Injunction is Granted*

The Consumer Federation of America would be injured if payment for its completed work was enjoined. This is a factor, but not a major one, because the CFA has been paid for all but about $5,000 of the $23,000 contract price.

*The Public Interest*

The court perceives two "public interest" factors in this case. First, this court looks with disfavor on interlocutory attempts to challenge federal agency action, because of the disruption such efforts cause to agency proceedings. This is reflected in part by the heavy burden plaintiffs must carry to obtain a preliminary injunction, and in part by this court's reluctance to interfere with ongoing agency proceedings absent compelling justification. Second, the court considers it in the public interest to allow all possible views to be placed before the agency, from a consumer or any other perspective. In this case the USDA determined before soliciting bids that insufficient data existed concerning the economic impact of the proposed regulations. Plaintiffs AMI and NBC met part of this need with their submissions, although they claim their submissions could have been more complete. The proposed CFA study will add further perspective. It would appear to be in the public interest to allow the USDA to evaluate all of this material together in light of its expertise and its statutory responsibility to act in the public interest.

The motion for a preliminary injunction will be denied. An appropriate Order accompanies this Memorandum Opinion.