**AT & T CORP.; Tele–Communications, Inc.; TCI Cablevision of Oregon, Inc., and TCI of Southern Washington, Plaintiffs,**

v.

**CITY OF PORTLAND and Multnomah County, Defendants.**

**No. CV 99–65–PA.**

United States District Court, D. Oregon.

June 3, 1999.

1148

Duane A. Bosworth, Davis, Wright, Tremain, LLP, Portland, OR, for AT & T Corp., Tele–Communications, Inc. TCI Cablevision of Oregon, Inc. TCI of Southern Washington, plaintiffs.

Paul T. Fortino, Lawrence H. Reichman, Chin See Ming, Perkins, Coie, LLP, Portland, OR, for U S West Interprise America, Inc., Oregon Internet Service Provider Association, OGC Telecomm, Ltd., Applicants for Intervention.

Terence Thatcher, Benjamin Walters, Office of the City Attorney, Portland, OR, for City of Portland, Defendant.

Gerald Itkin, Multnomah County Counsel, Portland, OR, for Multnomah County, Defendant.

## OPINION

PANNER, District Judge.

Plaintiffs AT & T Corp., Tele–Communications Inc. (TCI), TCI Cablevision of Oregon, Inc., and TCI of Southern Washington, bring this action for declaratory relief against defendants City of Portland and Multnomah County, and intervenor-defendants U S West Interprise America, Inc., GTE Internetworking Inc., Oregon Internet Service Provider Association, and OGC Telecomm, Ltd. Plaintiffs challenge a City ordinance and a County resolution requiring that AT & T allow Internet service providers (ISPs) not affiliated with AT & T to connect their equipment directly to AT & T's cable modem platform, bypassing @Home, AT & T's proprietary cable ISP. Plaintiffs claim that the open access requirement is preempted by federal statutes regulating cable television; violates the First Amendment, Commerce Clause, and Contract Clause of the United States Constitution, and the contract clause of the Oregon Constitution; and breaches the parties' franchise agreements.

The parties file cross-motions for summary judgment. The parties agree that I should treat intervenor-defendants' motion to dismiss as a motion for summary judgment. I grant defendants' motions and deny plaintiffs' motion.

## BACKGROUND

In other communities, plaintiffs offer @Home, a service that gives residential cable subscribers high-speed access to the Internet. "The @Home service comprises a private broadband network and interactive on-line service distributed in part though existing cable infrastructure, using the @Home Network's high-speed national backbone and a cable modem." Barbara Esbin, *Internet Over Cable: Defining the Future in Terms of the Past,* 7 CommLaw Conspectus 37, 91 (1998).

The @Home private network transmits to the cable operator's "headend," which is where the operator runs its transmitting equipment. If the open access requirement goes into effect, the headend is where unaffiliated ISPs would install their own equipment to access the cable modem platform.

From the headend, the cable operator transmits through fiber optic cable to fiber nodes, which serve local networks of several hundred houses linked by coaxial cable. Each subscriber receives a two-way cable connection to the @Home network through a cable modem attached to the subscriber's personal computer. Pls.' Hr'g Exh. (unnumbered).

Cable allows much higher transmission speeds than conventional telephone lines:

> The cable industry's broadband platform makes cable an optimal medium for transmitting large amounts of digital information—data, graphics, and video— at high speeds. Upgraded cable systems can, depending upon usage conditions, carry data up to 1000 times faster than transmission using dial-up modems over ordinary copper twisted-pair phone lines, and 100 times faster than ISDN (integrated services digital network) phone lines.

Esbin, *Internet Over Cable*, 7 CommLaw Conspectus at 90. According to defendants, a file that would download in about 15 minutes with a 28.8 kilobits-per-second modem could download in about 1 second with a cable modem. Internet connections through cable modems are active whenever a subscriber's personal computer is on, without tying up phone lines.

In June 1998, AT & T and TCI announced their intent to merge in 1999. TCI would become a wholly owned subsidiary of AT & T. As required by TCI's three cable franchise agreements with the City and County, plaintiffs requested approval for the change of control to AT & T.

The Mt. Hood Cable Regulatory Commission (the Commission), which advises the City and County, evaluated plaintiffs' requested change in control. The Commission held public hearings about the merger's effect on local cable service. Representatives of plaintiffs and intervenor-defendants, among others, spoke at the hearings.

Representatives of unaffiliated ISPs told the Commission that the ISPs couldn't compete with @Home's higher speed, wide availability, and relatively low cost. Cable subscribers could access unaffiliated ISPs only through the @Home service at the full retail rate. Few subscribers would pay twice for similar services. The ISPs claimed that they would be driven out of business, eliminating several hundred jobs and costing the local economy $20 million.

 The Commission found that @Home had no viable competitors in the local retail market for residential Internet access services. The Commission recommended that the City and County regulate AT & T's cable modem platform as an "essential facility" to protect competition. "Essential facility" is a term of art in antitrust law, meaning a facility that competitors cannot practically duplicate and that is otherwise unavailable. *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1210 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998). A business that controls an essential facility may not exclude competitors without a "legitimate business reason for the refusal." *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1379 (9th Cir.1992).

The Commission intended that the open access requirement allow customers of unaffiliated ISPs to "obtain direct access to their [ISP] of choice without having to pay the full @Home retail rate." Defs.' Mem. in Supp. of Cross Mot., at 5. Unaffiliated ISPs would not get a free ride on the cable modem platform. They would pay AT & T for access.

On December 17, 1998, the City and County adopted mandatory access provisions:

> *Non-discriminatory access to cable modem platform.* Transferee [i.e., AT & T] shall provide, and cause Franchisees to provide, nondiscriminatory access to Franchisees' cable modem platform for providers of internet and on-line services, whether or not such providers are affiliated with Transferee or Franchisees, unless otherwise required by applicable law. So long as cable modem services are deemed by law to be "cable services", as provided under Title VI of the Communications Act of 1934, as amended, Transferee and Franchisees shall comply with all requirements regarding such services, including, but not limited to, the inclusion of revenues from cable modem services and access within the gross revenues of Franchisees' cable franchises, and commercial leased access requirements.

Luppold Affid., Exh. 29, at 6 (County Resolution 98–208); Exh. 32, at 5 (City Ordinance 172955).

On December 29, 1998, AT & T rejected the mandatory access provision. On January 7 and 8, 1999, the County and City stated that AT & T's rejection "resulted in a denial, effective December 29, 1998, . . . of AT & T's request for a change in control in the TCI franchises." Plaintiffs then filed this action.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Because there are no disputed issues of material fact, these summary judgment motions will resolve the issues.

## DISCUSSION

The issue is whether the City and County have the power to require access to the cable modem platform as a condition of approving AT & T's takeover of the cable franchises. To resolve the legal issue, I don't need to consider whether the open access requirement is good policy.

### I. Preemption

Plaintiffs contend that the open access requirement is preempted by federal statutes regulating cable television. I conclude that the open access requirement is within the authority of the City and County to protect competition.

### A. Standards

■ Federal law can preempt state law in one of two ways. Congress may either explicitly state its intent to preempt state law in the language of a statute or Congress may imply its intent to preempt through the structure and purpose of a statute. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604[ ] (1977). Implicit preemption can itself take two forms. Congress may either occupy a field by passing a statutory scheme so extensive that it covers an entire legislative field or Congress may enact a federal law which makes compliance with a state law impossible. *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664[ ] (1982).

*Kennedy v. Collagen Corp.,* 67 F.3d 1453, 1456 (9th Cir.1995), *overruled in part on other grounds, Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *see also Storer Cable Communications v. City of Montgomery,* 806 F.Supp. 1518, 1530 n. 4 (M.D.Ala.1992) ("Preemption analysis is same whether it is a state law or local ordinance which is being subjected to scrutiny."). The touchstone of preemption analysis is congressional intent. *Committee of Dental Amalgam Mfrs. and Distribs. v. Stratton,* 92 F.3d 807, 811 (9th Cir.1996), *cert. denied,* 519 U.S. 1084, 117 S.Ct. 754, 136 L.Ed.2d 690 (1997).

### B. Discussion

#### 1. 47 U.S.C. § 556: Preemption and Local Authority

The preemption analysis begins with 47 U.S.C. § 556, which addresses generally when the federal statutes governing cable preempt state and local regulations:

**Coordination of Federal, State, and local authority**

**(a) Regulation by States, political subdivisions, State and local agencies, and franchising authorities**

Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter.

**(b) State jurisdiction with regard to cable services**

Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter.

**(c) Preemption**

Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.

47 U.S.C. § 556. Section 556 shows that Congress intended to interfere as little as possible with existing local government au-

thority to regulate cable franchises. *See City of Dallas v. F.C.C.*, 165 F.3d 341, 347 (5th Cir.1999). Local governments were regulating cable television before the FCC assumed jurisdiction in the mid–1960s. *Id.* at 348 & n. 5; *Midland Telecasting Co. v. Midessa Television Co.*, 617 F.2d 1141, 1146 (5th Cir.1980).

■ Courts have long recognized a city's power to promote competition in the local economy. *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 547–48, 9 L.Ed. 773 (1837). If Congress wants a statute to preempt a power traditionally held by states or local governments, Congress must make its intent "unmistakably clear" in the statute's wording. *City of Dallas*, 165 F.3d at 347–48 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (additional citation omitted)).

### 2. 47 U.S.C. § 533(d)(2): Preserving Competition

Congress specifically recognizes the power of local franchising authorities to preserve competition for cable services. Under 47 U.S.C. § 533(d)(2):

> Any State or franchising authority may not prohibit the ownership or control of a cable system by any person because of such person's ownership or control of any other media of mass communications or other media interests. *Nothing in this section shall be construed to prevent any State or franchising authority from prohibiting the ownership or control of a cable system in a jurisdiction by any person*
>
> . . . . .
>
> (2) *in circumstances in which the State or franchising authority determines that the acquisition of such a cable system may eliminate or reduce competition in the delivery of cable service in such jurisdiction.*

(Emphasis added.)

Local franchising authorities have the power to determine whether a change of ownership or control would "eliminate or reduce competition." It is not my role to second-guess the findings supporting the decision to impose open access. So long as the City and County act within their jurisdiction, their findings are entitled to deference. *See New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (equal protection challenge to city ordinance); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488–89, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

■ The franchising authority's power to prohibit a change of control includes the lesser power to impose conditions under which it will permit a change of control. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 836, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) ("the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end."); *O'Connell v. Shalala*, 79 F.3d 170, 177 (1st Cir.1996) ("the statutory grant of a greater power typically includes the grant of a lesser power").

### 3. 47 U.S.C. § 541(c): Common Carrier Regulation

■ Plaintiffs contend that the mandatory access provision is preempted because it regulates plaintiffs' cable system as a common carrier. Plaintiffs cite 47 U.S.C. § 541(c), which provides that "[a]ny cable system shall not be subject to regulation as a common carrier or utility by reason of providing any cable service."

The statutory definition of "common carrier" offers little guidance here. *See* 47 U.S.C. § 153(10) ("common carrier" means "any person engaged as a common carrier for hire . . ."); *see Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1480 (D.C.Cir. 1994). Courts have defined common carrier:

> [T]he primary sine qua non of common carrier status is a quasi-public character, which arises out of the undertaking to

carry for all people indifferently. This does not mean that the particular services offered must practically be available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users.... A second prerequisite to common carrier status [is] ... that the system be such that customers transmit intelligence of their own design and choosing.

*Id.,* 19 F.3d at 1480 (quoting *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 533 F.2d 601, 608–09 (D.C.Cir.1976)).

Requiring that a business allow its competitors access to an essential facility is not the same as regulating that business as a common carrier. *See FCC v. Midwest Video Corp.,* 440 U.S. 689, 707 n. 16, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (distinguishing impermissible regulations requiring that cable operators allow any member of the public to produce a program from permissible regulations requiring that cable operators carry local broadcast stations). The open access requirement applies only to competing ISPs, so it does not impose "a duty to hold out facilities indifferently for public use and thus [does] not compel cable operators to function as common carriers." *Id.*

### 4. 47 U.S.C. § 544(e): Transmission Technology

■ Plaintiffs argue that the open access requirement is preempted because it imposes technical conditions on plaintiffs' use of the cable modem platform. Under 47 U.S.C. § 544(e), local franchising authorities may not "prohibit, condition, or restrict a cable system's use of any type of subscriber equipment or any transmission technology." Plaintiffs state that they will need to modify their equipment at the headend so that competing ISPs can use the cable modem platform. I agree with defendants, however, that the mandatory access provision does not condition or limit AT & T's use of subscriber equipment or transmission technology. The provision

does not tell AT & T how to implement open access, nor does it require that AT & T use any particular transmission technology.

### 5. 47 U.S.C. § 544(f)(1): Content of Cable Services

■ Plaintiffs contend that the open access requirement is preempted because it "impose[s] requirements regarding the provision or content of cable services." 47 U.S.C. § 544(f)(1). Plaintiffs complain that the requirement would force AT & T to carry the programming of competing ISPs.

AT & T has already agreed to allow @Home subscribers access to unaffiliated ISPs. *See In re Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from Tele-Communications, Inc., Transferor, to AT & T Corp., Transferee,* CS Docket No. 98–178, FCC No. 99–24, Mem. Op. & Order, 15 Com. Reg. (P & F) 29, ____, at ¶ 96, 1999 WL 76930 (F.C.C.) (released Feb. 18, 1999) (FCC order approving TCI–AT & T merger). As applied, the open access requirement is content-neutral, affecting only economic arrangements. *See Storer,* 806 F.Supp. at 1545 (" § 544(f)'s concern is with 'content-based rules' which require or forbid cable providers from carrying particular programming.") (citing *United Video, Inc. v. FCC,* 890 F.2d 1173, 1189 (D.C.Cir.1989)).

### 6. 47 U.S.C. §§ 531, 532, 534, 535: Programming Provisions

■ Plaintiffs argue that because Congress required that cable operators provide access for programming in only specific categories ("must-carry" rules for local television; public, educational, and governmental channels; and leased access), Congress intended to preempt local authorities from imposing additional access rules on cable operators. I disagree.

The open access requirement is not inconsistent with the statutes cited by plain-

tiffs because the requirement does not force AT & T to carry any particular programming. Instead, AT & T must allow unaffiliated ISPs physical access to its facilities. AT & T has already agreed that it would allow cable subscribers indirect access to competing ISPs.

## II. Constitutional Claims

### A. First Amendment

■ Plaintiffs contend that the mandatory access provision violates their First Amendment rights. There is no free speech violation, however, because AT & T volunteered to give cable subscribers access to competing ISPs. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (requirement that shopping center owner allow protesters access did not violate owner's First Amendment rights because shopping center was "open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner.").

The open access requirement is an economic regulation. It does not force plaintiffs to carry any particular speech. *See id.* ("[N]o specific message is dictated by the State to be displayed on appellants' property. There consequently is no danger of governmental discrimination for or against a particular message."). Plaintiffs have not presented evidence that cable subscribers accessing the Internet through AT & T's cable modem platform would associate AT & T with the speech of unaffiliated ISPs. *See AMSAT Cable, Ltd. v. Cablevision of Connecticut,* 6 F.3d 867, 874 (2d Cir.1993) (no evidence that transmission of cable system's programming into apartments would cause tenants to associate apartment owner with cable system).

■ Even if the open access requirement could be said to affect plaintiffs' free speech rights, the requirement passes the Supreme Court test for reasonableness. *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968);

*Chicago Cable Communications v. Chicago Cable Com'n,* 879 F.2d 1540, 1548 (7th Cir.1989) (*"O'Brien* is an appropriate standard-bearer for dealing with questions of local regulation of cable television."). The open access provision is within constitutional power of the City and County, it furthers the substantial governmental interest in preserving competition, the governmental interest is unrelated to the suppression of free speech, and the incidental restriction on free speech is no greater than necessary.

### B. Commerce Clause

■ Plaintiffs contend that the open access requirement violates the Commerce Clause by unduly burdening interstate commerce. U.S. Const., art. I, § 8, cl. 3. The requirement does not violate the Commerce Clause, however, because it affects cable service in the Portland metropolitan area only. Although plaintiffs contend that the open access requirement would impose extra expenses on them, they have not shown that the incidental burden on interstate commerce caused by these expenses would outweigh the local benefits of encouraging competition. *Kleenwell Biohazard Waste and General Ecology Consultants, Inc. v. Nelson,* 48 F.3d 391, 399 (9th Cir.1995). *See also Storer,* 806 F.Supp. at 1552, 1554 (if franchising authority's action survives preemption challenge, Commerce Clause challenge becomes in effect a second round "of preemption scrutiny").

Plaintiffs argue that defendants have no procedures in place to implement the open access requirement. Defendants respond that open access is technically feasible, and that the unaffiliated ISPs would supply the hardware needed to connect to AT & T's cable modem platform. *See* Exhs. to Defs.' Reply, Exh. 2. The Mt. Hood Cable Regulatory Commission has procedures for resolving disputes over franchise agreements, which would allow plaintiffs to be heard and to seek judicial review.

C. Contract Clause

 Plaintiffs contend that the open access requirement violates the Contract Clause, which provides that "No State shall ... pass any ... Law Impairing the Obligation of Contracts." U.S. Const., art. I, § 10. When analyzing a Contract Clause claim, the court must first determine whether the regulation has substantially impaired a contractual relationship. *Seltzer v. Conchrane (In re Seltzer)*, 104 F.3d 234, 236 (9th Cir.1996). If the regulation does substantially impair a private contract, the court then determines whether "the impairment is both reasonable and necessary to fulfill an important public purpose." *Id.* (citation omitted).

Plaintiffs cite provisions allowing the City and the County to condition a transfer of control "upon such conditions, related to technical, legal, and financial qualifications [of the prospective transferee] to perform according to the terms of the Franchise, as it deems appropriate." Pls.' Mem. in Supp. at 14 (quoting franchise agreements). (I will assume that franchise provisions governing transfers apply here, even though plaintiffs sought a change of control rather a transfer.) According to plaintiffs, the mandatory access provision is unrelated to AT & T's technical, legal, or financial qualifications to perform under the franchise agreements.

 The City and County respond that their authority to impose conditions regarding a prospective transferee's legal qualifications includes the power to prevent an antitrust violation. They argue that "the right to hold a franchise at all— the most fundamental *legal qualification* for a transferee—can depend on the competitive effects of a transferee's operation of the franchise."

I conclude that the mandatory access provision is related to AT & T's legal qualifications to assume control of TCI's cable franchises. The mandatory access provision does not substantially impair plaintiffs' contractual rights under the franchise agreements.

D. Contract Clause of the Oregon Constitution

Plaintiffs claim that the mandatory access provision violates the Oregon Constitution's contract clause. *See* Or. Const., art. I, § 21 ("No ... law impairing the obligation of contracts shall ever be passed"). Here, for the reasons that I grant summary judgment against plaintiffs' federal Contract Clause claim, I conclude that the mandatory access provision does not violate the Oregon contract clause. *See Stovall v. State ex rel. Oregon Dep't of Transp.*, 324 Or. 92, 112, 922 P.2d 646, 657 (1996).

III. Breach of Franchise Agreement

 Plaintiffs claim that the mandatory access provision breaches the existing franchise agreements. The franchise agreements provide that the City and County may reasonably regulate the franchisee's privileges in the public interest, and that the franchisee must comply with valid regulations "so long as such actions do not materially affect the rights" of the franchisee. Luppold Affid., Exh. 1, at 47, 48 (City Franchise Agreement); Exh. 3, at 33 (County Franchise Agreement). The franchise agreements control if a City or County regulation "directly conflict[s]" with the terms of the agreements.

I agree with defendants that the open access requirement does not conflict with the terms of the franchise agreements, and that plaintiffs have no contractual right under the franchise agreements to exclude competitors from the cable modem platform.

The franchise agreements do not limit the factors that the City and County may consider in deciding whether to approve a change in control. Even assuming that the substitution of AT & T should be considered a transfer rather than a change in control, the City and County may reasonably consider the effect of a transfer on competition.

## CONCLUSION

Defendants' motion for summary judgment (#) and intervenor-defendants' motion to dismiss (#) are granted. Plaintiffs' motion for partial summary judgment (#) is denied.