**AT&T CORPORATION; TCI Cablevision of Oregon, Incorporated; TCI of Southern Washington, Plaintiffs–Appellants,**

and

**Tele–Communications, Inc., Plaintiff,**

and

**US West Interprise America, Inc.; Oregon Internet Service Provider Association; OGC Telecomm, Ltd., dba Integra Telecom, Intervenors,**

v.

**CITY OF PORTLAND; Multnomah County, Defendants–Appellees,**

**GTE Internetworking, Inc., Intervenor.**

No. 99–35609

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1999

Filed June 22, 2000

David W. Carpenter (argued), Sidley & Austin, Chicago, Illinois, for plaintiffs-appellants AT & T Corp., Telecommunications, Inc., TCI Cablevision of Oregon, Inc., and TCI of Southern Washington.

Terence L. Thatcher (argued), Deputy City Attorney, Portland, Oregon; Joseph Van Eaton, Miller & Van Eaton, Washington, D.C., for defendants-appellees City of Portland and Multnomah County.

William T. Lake (argued) and William R. Richardson, Jr., Matthew A. Brill, Wilmer, Cutler & Pickering, Washington, D.C., for intervenors-appellees US WEST Interprise America, Inc., and GTE Internetworking Inc.

Paul T. Fortino, Lawrence Reichman, Chin See Ming, Perkins Coie LLP, for US West Interprise America, Inc. and OGC Telecomm, Ltd.

Janis C. Kestenbaum, Jenner & Block, Washington, D.C., for intervenor-appellee Oregon Internet Service Providers Association.

David J. Newburger, Newburger & Vossmeyer, St. Louis, Missouri, for amici curiae American Council of the Blind, Missouri Association of the Deaf, Missouri Council of the Blind, Oklahoma Able Tech, Paraquad, Inc., and National Silver Haired Congress.

Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Washington, D.C., for amicus curiae At Home Corp.

Robert C. Fellmeth, University of San Diego School of Law, San Diego, California, for amicus curiae Center for Public Interest Law.

Bruce J. Wecker, Furth, Fahrner & Mason, San Francisco, California, for amici curiae Citizens' Utility Board of Oregon, Consumer Action, Consumer Federation of America, The Utility Reform Network, and Utility Consumers' Action Network.

James M. Carr, Office of General Counsel, Washington, D.C., for amicus curiae Federal Communications Commission.

Christopher Wolf, Proskauer Rose, Washington, D.C., for amicus curiae Hands Off the Internet.

Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Washington, D.C., for amicus curiae National Cable Television Association, California Cable Television Association, Oregon Cable Telecommunications Association, and Washington State Cable Communications Association.

Paul Mogin, Williams & Connolly, Washington, D.C., for amicus curiae openNET Coalition.

Jayne Chong-Soon Lee, Office of City Attorney, San Francisco, California, for amici curiae U.S. Conference of Mayors, National Association of Counties, National League of Cities, National Association of Telecommunications Officers and Administrators, Jefferson County, King County, Montgomery County, Michigan Coalition to Protect Public Rights of Way from Telecommunications Encroachments, Sacramento Metropolitan Cable Television Commission, San Mateo County Telecommunications Authority, Bell-Cudahy Cable Television Authority, and the Cities of Arvada, Atlanta, Baltimore, Boston, Dearborn, Los Angeles, New York, Rancho Palos Verdes, San Diego, San Francisco, San Jose, and Walnut Creek.

Before: LEAVY, FERNANDEZ, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

This appeal presents the question of whether a local cable franchising authority may condition a transfer of a cable franchise upon the cable operator's grant of unrestricted access to its cable broadband transmission facilities for Internet service providers other than the operator's proprietary service. We conclude that the Communications Act prohibits a franchising authority from doing so and reverse the judgment of the district court.

I

Distilled to its essence, this is a struggle for control over access to cable broadband technology. In broadband data transmission, a single medium carries multiple communications at high transmission speeds. The allure of broadband technology is that it allows users to access the Internet at speeds fifty to several hundred times faster than those available

through conventional computer modems connected to what is commonly referenced in the telecommunications industry as "plain old telephone service." Broadband allows transmission, or "streaming," of live video and audio communications, as well as video and audio data files. To satisfy consumer demand for broadband Internet access, cable television operators have replaced coaxial wires with fiber-optic cable, telephone companies have initiated high-frequency digital subscriber line ("DSL") services over standard twisted-pair copper wires, fixed wireless providers have upgraded their microwave transmission capacities, satellite providers have launched global two-way digital networks, and researchers have explored the use of quantum communication methods.

The race to acquire broadband transmission systems has, in part, prompted a number of corporate mergers. This appeal concerns the merger between AT & T, at the time the nation's largest long distance telephone provider, and Telecommunications, Inc. ("TCI"), one of the nation's largest cable television operators. In addition to providing traditional cable television programming, TCI provided cable broadband Internet access to consumers in certain geographic areas. Since acquiring TCI, AT & T has continued to offer cable broadband access as part of its "@Home" service, which bundles its cable conduit with Excite, an Internet service provider ("ISP") under an exclusive contract. Like many other ISPs, @Home supplements its Internet access with user e-mail accounts and a Web portal site, a default home page gateway offering Internet search capabilities and proprietary content devoted to chat groups, interactive gaming, shopping, finance, news, and other topics. @Home subscribers also may "click-through" to other free Web portal sites, and may access other Internet service providers if they are willing to pay for an additional ISP; however, subscribers cannot purchase cable broadband access separately from an unaffiliated ISP, and have no choice over terms of Internet service such as content and bandwidth restrictions.

The @Home cable broadband infrastructure differs from that of most ISPs. A typical ISP connects with the Internet via leased telecommunications lines, which its consumers access through "dial-up" connections over ordinary telephone lines. @Home operates a proprietary national "backbone," a high-speed network parallel to the networks carrying most Internet traffic, which connects to those other Internet conduits at multiple network access points. This backbone serves regional data hubs which manage the network and deliver Excite's online content and services, including multimedia content that exploits broadband transmission speeds. Each hub connects to local "headend" facilities, cable system transmission plants that receive and deliver programming, where "proxy" servers cache frequently requested Internet data, such as Web sites, for local delivery. Each headend connects to cable nodes in neighborhoods, each of which in turn connects via coaxial cable to the user's cable modem and computer.

To effect the merger, AT & T and TCI sought three types of regulatory approval. The Department of Justice approved the merger on antitrust grounds, subject to TCI's divestiture of its interest in Sprint PCS wireless services. *See United States v. AT & T Corp., Tele–Communications, Inc.,* No. CIV. 98 CV03170, 1999 WL 1211462 (D.D.C. Aug.23, 1999) (final judgment). The Federal Communications Commission ("FCC") approved the transfer of federal licenses from TCI to AT & T, after addressing public interest concerns in four service areas, including residential Internet access. *See Applications for Consent to the Transfer of Licenses and Section 214 Authorizations from TCI to AT & T,* 14 F.C.C.R. 3160, 1999 WL 76930 (1999) (*"Transfer Order"*).

One of the issues that the FCC considered forms the undercurrent of the present controversy: whether to impose a requirement of open access to cable

broadband facilities. A variety of interest groups and competitors argued that allowing AT & T to restrict cable broadband access to the proprietary @Home service would harm competition and reduce consumer choice. In its order approving the license transfer, the FCC rejected any open access condition, citing the emergence of competing methods of high-speed Internet access, and @Home customers' "ability to access the Internet content or portal of his or her choice." It found "that the equal access issues raised by parties to this proceeding do not provide a basis for conditioning, denying, or designating for hearing any of the requested transfers of licenses and authorizations." *Transfer Order* at ¶ 96. The FCC concluded that "while the merger is unlikely to yield anti-competitive effects, we believe it may yield public interest benefits to consumers in the form of a quicker roll-out of high-speed Internet access services." *Transfer Order* at ¶ 94.

The last regulatory hurdle that AT & T and TCI faced was the approval of local franchising authorities where required by local franchising agreements. *See* 47 U.S.C. § 537 (permitting franchising authority approval of cable system sales when the franchise agreement so requires). TCI's franchises with Portland and Multnomah County (collectively, "Portland") permitted the city to "condition any Transfer upon such conditions, related to the technical, legal, and financial qualifications of the prospective party to perform according to the terms of the Franchise, as it deems appropriate." This language parallels the text of 47 U.S.C. § 541(a)(4)(C), which describes the conditions a locality may impose on a franchise.

Portland referred the transfer application for recommendation by the Mount Hood Cable Regulatory Commission, an intergovernmental agency overseeing cable affairs in the Portland region. In response to Portland's preliminary questions, AT & T confirmed that TCI was in the process of upgrading its cable system to support @Home over cable broadband, and maintained that @Home was a proprietary product "not subject to common carrier obligations." At public hearings, the incumbent local telephone exchange carrier U.S. WEST and the Oregon Internet Service Providers Association called for open access to TCI's cable broadband network, citing-in addition to consumer welfare-the need for "a level playing field" with U.S. WEST's common carrier obligations and a "very real potential that consumer [Internet] access businesses could go out of business." The Mount Hood Commission recommended that the city and county approve the transfer of franchise control subject to an open access requirement.

On December 17, 1998, Portland and Multnomah County voted to approve the transfer, subject to an open access condition expressed in a written acceptance:

*Non-discriminatory access to cable modem platform.* Transferee shall provide, and cause the Franchisees to provide, non-discriminatory access to the Franchisees' cable modem platform for providers of Internet and on-line services, whether or not such providers are affiliated with the Transferee or the Franchisees, unless otherwise required by applicable law. So long as cable modem services are deemed to be "cable services," as provided under Title VI of the Communications Act of 1934, as amended, Transferee and the Franchisees shall comply with all requirements regarding such services, including but not limited to, the inclusion of revenues from cable modem services and access within the gross revenues of the Franchisees' cable franchises, and commercial leased access requirements.

AT & T refused the condition, which resulted in a denial of the request to transfer the franchises. AT & T then brought this action, seeking declarations that the open access condition violated the Communications Act of 1934, as amended by the Tele-

communications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), codified at 47 U.S.C. § 151, *et seq.* (collectively, the "Communications Act"), the franchise agreements, and the Constitution's Commerce Clause, Contract Clause, and First Amendment. The district court rejected all of AT & T's claims and granted summary judgment to Portland. *See AT & T Corp. v. City of Portland,* 43 F.Supp.2d 1146 (D.Or.1999). We review de novo a grant of summary judgment; there being no disputed factual issues, we face only a question of statutory interpretation. *See Fort Belknap Indian Community v. Mazurek,* 43 F.3d 428, 432 (9th Cir.1994).

## II

■ The parties, and numerous amici, forcefully urge us to consider what our national policy should be concerning open access to the Internet. However, that is not our task, and in our quicksilver technological environment it doubtless would be an idle exercise. The history of the Internet is a chronicle of innovation by improvisation, from its genesis as a national defense research network, to a medium of academic exchange, to a hacker cyber-subculture, to the commercial engine for the so-called "New Economy." Like Heraclitus at the river, we address the Internet aware that courts are ill-suited to fix its flow; instead, we draw our bearings from the legal landscape, and chart a course by the law's words. To that end, "we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy." *United States v. Mohrbacher,* 182 F.3d 1041, 1048 (9th Cir.1999) (citation omitted). We note at the outset that the FCC has declined, both in its regulatory capacity and as amicus curiae, to address the issue before us. Thus, we are not presented with a case involving potential deference to an administrative agency's statutory construction pursuant to the *Chevron* doctrine. *See Food and Drug Administration v. Brown & Williamson Tobacco Corp.,* —— U.S.

——, 120 S.Ct. 1291, 1300–01, 146 L.Ed.2d 121 (2000).

### A

■ Because Portland premised its open access condition on its position that @Home is a "cable service" governed by the franchise, we begin with the question of whether the @Home service truly is a "cable service" as Congress defined it in the Communications Act. We conclude that it is not.

Subject to limited exceptions, the Communications Act provides that "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1). The Act defines "cable service" as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6). For the purposes of this definition, "video programming" means "programming provided by, or generally considered comparable to programming provided by, a television broadcast station," 47 U.S.C. § 522(20), and "other programming service" means "information that a cable operator makes available to all subscribers generally." 47 U.S.C. § 522(14). The essence of cable service, therefore, is one-way transmission of programming to subscribers generally.

This definition does not fit @Home. Internet access is not one-way and general, but interactive and individual beyond the "subscriber interaction" contemplated by the statute. Accessing Web pages, navigating the Web's hypertext links, corresponding via e-mail, and participating in live chat groups involve two-way communication and information exchange unmatched by the act of electing to receive a one-way transmission of cable or pay-per-view television programming. And unlike transmission of a cable television signal, communication with a Web site involves a series of connections involving two-way in-

formation exchange and storage, even when a user views seemingly static content. Thus, the communication concepts are distinct in both a practical and a technical sense. Surfing cable channels is one thing; surfing the Internet over a cable broadband connection is quite another.

Further, applying the carefully tailored scheme of cable television regulation to cable broadband Internet access would lead to absurd results, inconsistent with the statutory structure. For example, cable operators like AT & T may be required by a franchising authority to set aside cable channels for public, educational or governmental use, see 47 U.S.C. § 531, must designate some of their channels for commercial use by persons unaffiliated with the operator, see 47 U.S.C. § 532, and must carry the signals of local commercial and non-commercial educational television stations, see 47 U.S.C. §§ 534 & 535. We cannot rationally apply these cable television regulations to a non-broadcast interactive medium such as the Internet. As our sister circuit concluded in the context of the abortive "video dialtone" common carrier television technology, regulating @Home as a cable service "simply makes no sense in any respect, and would be infeasible in many respects." *National Cable Television Ass'n. v. FCC*, 33 F.3d 66, 75 (D.C.Cir.1994).

Thus, because the Internet services AT & T provides through @Home cable modem access are not "cable services" under the Communications Act, Portland may not directly regulate them through its franchising authority.

## B

■ Although we conclude that a cable operator may provide cable broadband Internet access without a cable service franchise, we must also determine whether Portland may condition AT & T's provision of standard cable service upon its opening access to the cable broadband network for competing ISPs. To do so, we must determine how the Communications Act defines @Home.

Under the statute, Internet access for most users consists of two separate services. A conventional dial-up ISP provides its subscribers access to the Internet at a "point of presence" assigned a unique Internet address, to which the subscribers connect through telephone lines. The telephone service linking the user and the ISP is classic "telecommunications," which the Communications Act defines as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). A provider of telecommunications services is a "telecommunications carrier," which the Act treats as a common carrier to the extent that it provides telecommunications to the public, "regardless of the facilities used." 47 U.S.C. § 153(44) & (46).

By contrast, the FCC considers the ISP as providing "information services" under the Act, defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20) (1996). As the definition suggests, ISPs are themselves users of telecommunications when they lease lines to transport data on their own networks and beyond on the Internet backbone. However, in relation to their subscribers, who are the "public" in terms of the statutory definition of telecommunications service, they provide "information services," and therefore are not subject to regulation as telecommunications carriers. *See Federal–State Joint Board on Universal Service*, 13 F.C.C.R. 11501, ¶¶ BM, CB, 1998 WL 166178 (1998) (report to Congress); *cf.* Child Online Protection Act, Pub.L. No. 105–277, § 1403(e)(4), 112 Stat. 2681 (1998) (codified at 47 U.S.C. § 231(e)(4)) & Internet Tax Freedom Act, Pub.L. No. 105–277, § 1101(e), 112 Stat. 2681 (1998) (reproduced at note to 47 U.S.C. § 151(e) (1998))

(defining Internet access services as: "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services."). Indeed, "information services"—the codified term for what the FCC first called "enhanced services"—have never been subject to regulation under the Communications Act. *See Howard v. America Online, Inc.,* 208 F.3d 741, 752–53 (9th Cir.2000); *see also* 47 C.F.R. § 64.702(a); *California v. FCC,* 905 F.2d 1217, 1223–25 (9th Cir.1990) (discussing history of "enhanced services" non-regulation).

Like other ISPs, @Home consists of two elements: a "pipeline" (cable broadband instead of telephone lines), and the Internet service transmitted through that pipeline. However, unlike other ISPs, @Home controls all of the transmission facilities between its subscribers and the Internet. To the extent @Home is a conventional ISP, its activities are that of an information service. However, to the extent that @Home provides its subscribers Internet transmission over its cable broadband facility, it is providing a telecommunications service as defined in the Communications Act.

Under this taxonomy, the Communications Act bars Portland from conditioning the franchise transfer upon AT & T's provision of the @Home transmission element that constitutes telecommunications:

(3)(A) If a cable operator or affiliate thereof is engaged in the provision of telecommunications services—

(i) such cable operator or affiliate shall not be required to obtain a franchise under this title for the provision of telecommunications services; and

(ii) the provisions of this title shall not apply to such cable operator or affiliate for the provision of telecommunications services.

(B) A franchising authority may not impose any requirement under this title that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator or an affiliate thereof.

(C) A franchising authority may not order a cable operator or affiliate thereof—

(i) to discontinue the provision of a telecommunications service, or

(ii) to discontinue the operation of a cable system, to the extent such cable system is used for the provision of a telecommunications service, by reason of the failure of such cable operator or affiliate thereof to obtain a franchise or franchise renewal under this title with respect to the provision of such telecommunications service.

(D) Except as otherwise permitted by sections 611 and 612, a franchising authority may not require a cable operator to provide any telecommunications service or facilities, other than institutional networks, as a *condition of the initial grant of a franchise, a franchise renewal, or a transfer of a franchise.*

Pub.L. No. 104–104, § 303(a), 110 Stat. 56, 124–25 (1996), codified at 47 U.S.C. § 541(b)(3); *see also* § 101(a), 110 Stat. at 70, codified at 47 U.S.C. § 253(a) ("No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."). Subsection 541(b)(3) expresses both an awareness that cable operators could provide telecommunications services, and an intention that those telecommunications services be regulated as such, rather than as cable services.

■ The Communications Act includes cable broadband transmission as one of the "telecommunications services" a cable operator may provide over its cable system. Thus, AT & T need not obtain a franchise

to offer cable broadband, see 47 U.S.C. § 541(b)(3)(A); Portland may not impose any requirement that has "the purpose or effect of prohibiting, limiting, restricting or conditioning" AT & T's provision of cable broadband, see 47 U.S.C. § 541(b)(3)(B); Portland may not order AT & T to discontinue cable broadband, see 47 U.S.C. § 541(b)(3)(C); and Portland may not require AT & T to provide cable broadband as a condition of the franchise transfer, see 47 U.S.C. § 541(b)(3)(D). Therefore, under the several provisions of § 541(b)(3), Portland may not regulate AT & T's provision of @Home in its capacity as a franchising authority, and the open access condition contained in the franchise transfer agreement is void.

## C

Beyond the domain of cable-specific regulation, the definition of cable broadband as a telecommunications service coheres with the overall structure of the Communications Act as amended by the Telecommunications Act of 1996, and the FCC's existing regulatory regime. Elsewhere, the Communications Act contemplates the provision of telecommunications services by cable operators over cable systems. See, e.g., 47 U.S.C. § 224(d)(3) (authorizing FCC utility pole attachment rate-setting "for any pole attachment used by a cable system ... to provide any telecommunications service."). In the Telecommunications Act, Congress defined advanced telecommunications capability "without regard to any transmission media or technology," in terms that describe cable broadband: "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology." Pub.L. 104–104, § 706(c)(1), 110 Stat. 56, 153 (1996) (reproduced at note under 47 U.S.C. § 157). Consistent with our view, the FCC regulates DSL service, a high-speed competitor to cable broadband, as an advanced telecommunications service subject to common carrier obligations. See GTE Operating Companies Tariff No. 1, 13 F.C.C.R. 22466, 1998 WL 758441 (1998).

■ Among its broad reforms, the Telecommunications Act of 1996 enacted a competitive principle embodied by the dual duties of nondiscrimination and interconnection. See 47 U.S.C. § 201(a) ("It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor"); 47 U.S.C. § 251(a)(1) ("Each telecommunications carrier has the duty ... to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers"). Together, these provisions mandate a network architecture that prioritizes consumer choice, demonstrated by vigorous competition among telecommunications carriers. As applied to the Internet, Portland calls it "open access," while AT & T dysphemizes it as "forced access." Under the Communications Act, this principle of telecommunications common carriage governs cable broadband as it does other means of Internet transmission such as telephone service and DSL, "regardless of the facilities used." 47 U.S.C. § 153(46). The Internet's protocols themselves manifest a related principle called "end-to-end": control lies at the ends of the network where the users are, leaving a simple network that is neutral with respect to the data it transmits, like any common carrier. On this rule of the Internet, the codes of the legislator and the programmer agree.

■ Thus far, the FCC has not subjected cable broadband to any regulation, including common carrier telecommunications regulation. We note that the FCC has broad authority to forbear from enforcing the telecommunications provisions if it determines that such action is unnecessary to prevent discrimination and protect consumers, and is consistent with the public interest. See 47 U.S.C. § 160(a). Congress has reposed the details of tele-

communications policy in the FCC, and we will not impinge on its authority over these matters.

## III

 We hold that subsection 541(b)(3) prohibits a franchising authority from regulating cable broadband Internet access, because the transmission of Internet service to subscribers over cable broadband facilities is a telecommunications service under the Communications Act. Therefore, Portland may not condition the transfer of the cable franchise on non-discriminatory access to AT & T's cable broadband network. We need not reach AT & T's other statutory and constitutional arguments.

REVERSED.